THE REGENTS OF THE UNIVERSITY OF CALIFOR-
NIA Plaintiff and Appellant, v. B. R. MORRIS et al.,
Defendants and Appellants.

618

Thomas J. Cunningham, John P. Sparrow, Musick, Peeler & Garrett and George C. Hadley for Plaintiff and Appellant.

Fadem & Kanner, Fadem & Graves and Gideon Kanner for Defendants and Appellants.

ROTH, P. J.—B. R. Morris and Estelle Morris, husband and wife, (Morris) appeal from a judgment of $3,700,000 rendered in their favor in an eminent domain proceeding wherein the Regents of the University of California (Regents) condemned as public grounds of the university the Morris apartment and warehouse property located approximately five miles from the campus. Specifically, the property was condemned for use as a housing facility for married students and junior faculty members.

The Morris property had been part of a single complex of 647 apartment units situated between Sawtelle and Sepulveda Boulevards in West Los Angeles. The units were jointly owned by appellants Morris and Mr. E. K. Zuckerman, until they terminated their business association as of January, 1963. Pursuant to the termination, Morris took the property which is the subject of this lawsuit, to wit: a warehouse and 315 units (238 built in 1948 and 77 in 1958), of which 52 fronted on Sawtelle and the remaining 263 on Sepulveda. Mr. Zuckerman took 332 units, thereafter known as Park Vista Apartments (208 built in 1948 and 124 built in 1958) all fronting on Sawtele.

Prior to this action Regents had, in what they claim was an arms-length sale, purchased the Zuckerman property for $3,500,000. The Zuckerman property is of importance because the use or abuse by Regents of the sales price of the Zucker-

man property and whether and what the Regents term "a mirror sale" was a voluntary transaction, is one of the many grounds on which the Morris appeal is predicated.

Regents cross-appeal on the ground that they were, by reason of an entered judgment and recorded final order, entitled to possession of the condemned property on April 14, 1965, and therefore to rents, issues and profits therefrom to the date when they took actual possession on July 16, 1965 of the rental units and from April 14, 1965 to August 1, 1965, the date when they took actual possession of the warehouse.

We treat the cross-appeal of Regents first.

The sequence of events was as follows:

April 4, 1965, the jury returned a verdict awarding Morris the sum of $3,700,000 for the condemned property.

April 8, 1965, findings of fact and conclusions of law were settled by the court and filed.

April 9, 1965, the judgment for the total sum of $3,700,000 was entered.

The pertinent part of Finding VIII which is herein questioned, is as follows:

"It is . . . stipulated . . . that all rents shall be pro-rated as *of the date of taking possession by plaintiff.*" (Italics added.)

As originally submitted by Regents, said portion of Finding VIII read as follows:

"It is . . . stipulated . . . that all rents shall be pro-rated as *of the date of the recording of the Final Order of Condemnation herein.*" (Italics added.)

April 9, 1965, the judgment for the total sum of $3,700,000 was entered. In pertinent part it decreed:

". . . that payment to the court of the sum . . . shall be in full . . . for the real property . . . so taken in fee simple absolute. . . ."

On the same day the Regents deposited the total sum of the judgment.

April 12, 1965, final order of condemnation was signed and filed.

April 13, 1965, said final order was entered.

On April 14, 1965, said final order was recorded in the Office of the County Recorder.

In pertinent part the final order ". . . DECREED that the . . . real property be, . . . condemned in fee simple absolute to become the property of plaintiff. . . ."

It also provided:

"AND IT IS FURTHER ORDERED that all rents shall be prorated as of the date of taking possession by Plaintiff."

The Regents predicate their right to possession as of April 14, 1965 and their right to prorate rents, issues and profits as of that date, on those portions of the judgment and final order awarding and confirming the subject property to Regents in fee simple absolute and on the contention that the pertinent portion of Finding VIII as originally submitted, had so provided by stipulation, which was ignored by the court.

In support of Regents' position, the record shows without dispute that the amount of the judgment had been deposited as required; taxes had been prepaid by Regents on the condemned property from April 14 to June 30, 1965 and that by deposit in court of the judgment amount which included payment in full of all encumbrances on the subject property as of April 14, 1965, all interest charges on said encumbrances had been eliminated.

Morris contend the stipulation was to the contrary and resulted in the finding as signed by the court.

Morris in their brief concede that "the Regents had the power to take possession of the subject property at any time after judgment (C.C.P. § 1254). All the Regents had to do was to deposit in court the sums required by law. See C.C.P. § 1254(a). Thereupon, the Regents could have taken possession in 10 days. See C.C.P. § 1254(b) and (c). But instead the Regents did nothing for approximately three months."

■ We find no substantial evidence to support a stipulation upon which the Finding as proposed or as signed was made.

Abundant evidence indicates that there was no agreement between the parties for possession of the subject property or for the manner of prorating rents, issues and profits or any other obligations in respect of possession.

The record in fact showing that Morris did not desire to continue to operate the property and was willing to waive the formal 10-day notice, and that the parties entered into an aborted oral stipulation that Regents have possession as of May 1, 1963.

It is clear from the proceedings subsequent to April 8, 1965, the date findings were settled and filed that Regents had full knowledge that the stipulation in respect of proration as of April 14, 1965, had not been accepted by Morris or the court

and that it was not practical for the Regents to take possession of the rental units on April 14, 1965, or even immediately thereafter. Regents in fact participated in proceedings prior to April 14 and after that date to arrange to take possession on an entirely different date.

On April 8, counsel for Regents said:

". . . that administratively it might be just as well both for the University and for adversary, to have this matter of possession, if it is granted, granted at a time when it is near the first of the month. . . ."

". . . [The Regents] would probably like a target date of around May 1st.

"Mr. Fadem: The code provides if you want to make it May 1st, you have got to serve the order on us at least 10 days in advance of that.

"Mr. Hadley: That is right.

"Mr. Fadem: So that means you would have to present an order for immediate possession before April 20, . . . .

"Mr. Hadley: That is right."

Later, in respect of possession, the following took place:

"Mr. Drew: Our client, your Honor, wants possession on May 1st. They have paid the $3,700,000 . . . they have nothing to show for it. . . . [T]hey are entitled to possession. They have legal title to the property and——

"The Court: All right. However, so far as the 10-day provision is concerned, you would waive that, would you?

"Mr. Fadem: Day by day.

"The Court: Day by day.

"Mr. Fadem: Except one further thing, the warehouse. The warehouse is a special problem."

In the same discussion the following took place:

"Mr. Fadem: . . . I think what is happening here is that the Regents are trying to put pressure on the Court. . . . We are giving on this 10-day notice. They can give on the warehouse. They have no need for it.

"The Court: I think it would be a very nice thing if they would permit you to use the warehouse for a reasonable time to permit you to adjust your affairs, but I don't think the Court can say you can have possession of this and not of that. . . .

"The Court: . . . if I decide on next Monday, we will say, that they have the right, they will go into possession on May 1st, if that is the stipulation. Is that satisfactory to you?

"Mr. Drew: Yes, that is stipulated.

"Is that stipulated?

"Mr. Fadem: Yes."

It appears from a subsequent hearing that the proposed stipulation for possession on May 1st had never been acted upon; counsel for Morris advised the court:

"I might inform the Court nothing further has happened in regard to possession since the abortive preparations we made to turn over possession on May 1st. I don't want to depart from the record, but . . . the Court does have before it the indications of the preparations that we were . . . going on with University personnel . . . and our waiver of the ten days' time.

"The Court: So that Mr. and Mrs. Morris are still in possession and operating it?"

The abandonment by all parties of May 1st as the date of possession is verified by subsequent statements in the record. Counsel for Morris said:

". . . after we agreed to waive the ten days' notice . . . for taking possession on May 1st, that on the Friday before the Tuesday that possession was supposed to take place, while in fact the representatives of the University were in the office of Mr. Morris negotiating the details of the turn-over of possession, in the middle of that afternoon we were notified by Mr. Hadley that the University was not going to take possession. That point I think the Court knew, but I don't think it appears on the record."

In the same discussion from which the above excerpt is taken, counsel for Regents said:

". . . . Upon calling the University just before, that is, last Friday when I got these papers prepared, as to when they wanted to apply for the order and when they wanted to get possession, the Treasurer told me that they very much wanted to get it by July 15."

Thus, the record shows that although Morris waived the 10-day notice which the Regents were required to give and stipulated that the Regents could take possession on May 1, 1965, that the Regents did not act on said stipulation. Further, the record shows no notice to take possession was ever served by Regents on Morris and that the respective dates on which the

Regents took actual possession of the apartment portion and the warehouse portion of the subject property, were arrived at by the implicit or express consent of both.

■ Our conclusion is that possession was ultimately transferred by mutual consent with no provision for proration of rents, issues and profits, Regents relying on the stipulation they assert and Morris relying on the stipulation asserted by them.

The net result of the foregoing shows without dispute that Morris received the full amount of their portion of the judgment rendered with the opportunity to earn interest thereon, and in addition, Morris collected rents, issues and profits from the property for which they had been paid in full, free of taxes and interest charges on encumbrances.

The quoted portion of Finding VIII is not supported by substantial evidence. Further, by omission, even assuming arguendo the stipulation asserted by Morris, it goes further than the undisputed facts warrant.

There is no provision and there are no findings to compensate Regents for prepaid taxes and interest charges eliminated on encumbrances or to deduct interest Morris is presumed to earn on approximately $2,000,000, their portion of the judgment, from the rents, issues and profits collected by Morris during the period of their possession after Morris has deducted from such rents, issues and profits, all reasonable charges actually paid by Morris incident to the management, maintenance and operation of the subject property.

Morris were entitled to their cash portion of the judgment and to remain in possession for at least 10 days on the assumption that notice requiring giving up of possession would be promptly given. Such possession, however, does not include benefits Morris would never have had if the judgment of condemnation had never been entered.

The specific portion of Finding VIII heretofore quoted, should be stricken and new findings made to provide for an adjustment between the parties on all of the items discussed above. The judgment and final order should be corrected accordingly.

Morris bottom their appeal from the judgment on two broad grounds. ■ One attacks the right of Regents to condemn. All questions on this ground, we believe, were waived when Morris accepted payment of the judgment.[1] The second

---

[1]Code of Civil Procedure, section 1254, subdivision (f) states as follows: ''The defendant, who is entitled to the money paid into court for

ground comprises various errors which Morris claim affected the amount of the judgment.

We address ourselves first to three errors in the second classification which compel reversal.

■ The court improperly refused to admit evidence of the probability of rezoning in the near future. It is settled (*People* ex rel. *Dept. of Public Works* v. *Donovan* (1962) 57 Cal.2d 346 [19 Cal.Rptr. 473, 369 P.2d 1]; *Los Angeles etc. School Dist.* v. *Swensen* (1964) 226 Cal.App.2d 574 [38 Cal. Rptr. 214], that such evidence is admissible. In *Donovan,* the court said at page 352: ''Where there is a reasonable probability that zoning restrictions will be altered in the near future, the jury should consider not only those uses currently permitted, but also other uses to which the property could be devoted in the event of such a change [Citations]. The jury is entitled to and should consider those factors which a buyer would take into consideration in arriving at a fair market value, were he contemplating a purchase of the property [citations], and it is manifest that plausible and probable changes in the character of the neighborhood and in zoning restrictions in an area constitute such factors.''

The court also said in *Donovan* at page 353: ''. . . the defendant is not required to show that the zoning authorities were contemplating changes in zoning restrictions. The reasonable probability of a zoning change may be shown by a variety of factors, including neighborhood changes and general changes in land use.''

The Morris property comprises 16 acres in which are set clusters of buildings with open spaces around them. A portion thereof is occupied by a warehouse under a conditional use permit equivalent to C-3 use. It is bounded by commercial property on the north and on the south and fronts largely on a commercial street. It is located next to the interchange of two freeways. The bulk of the property is separated from other residential property by the San Diego Freeway.

him upon any judgment, shall be entitled to demand and receive the full amount of the judgment at any time thereafter upon obtaining an order therefor from the court. The court, or a judge thereof, upon application by such defendant, shall order and direct that the money so paid into court for him be delivered to him upon his filing a satisfaction of the judgment, or upon his filing a receipt therefor, and an abandonment of all defenses to the action or proceeding, except as to the amount of damages that he may be entitled to in the event that a new trial is granted. A payment to a defendant, as aforesaid, shall be held to be an abandonment by such defendant of all defenses interposed by him, excepting his claim for greater compensation.''

Mr. Metcalfe, the Morris expert, testified to studies he had made showing in detail all the adjacent and surrounding properties and to a number of rezoning changes in respect of adjacent properties and indicated the various factors which were present in those cases and which were similar to factors inherent in the subject property.[2]

When Morris sought to elicit the opinion of Mr. Metcalfe as to the probability of rezoning the subject property, an objection was made. A discussion was then had in chambers. The court, adopting language from an objection made by Regents,

---

[2]Some of the pertinent portions of Mr. Metcalfe's testimony, affecting zoning, is as follows:

"The study that I made commenced with an observation of the nature and character of Sepulveda Boulevard as it went by the front of the subject property, as it continued toward both the north and to the south.

"It then went to an observation or study of the type of development to be found along Sepulveda Boulevard in the general vincity of the subject property at or near the date of value.

". . . [O]ne of the next steps was obtaining information with regard to the traffic counts, which are of record on Sepulveda Boulevard, on National Boulevard, on Sawtelle Boulevard, and on the freeway at about the subject property, as that information was available about the date of value.

"The next step was to make an investigation of changes of zone in the general West Los Angeles district, as well as in other districts where property is somewhat similar in situation to the subject property, that is to say, fronting on a major highway, backing to a freeway and having commercial property at each end of the property.

"In making that study, I investigated something between 100 and 200 changes of zone on other properties in total, and made a tabulation of some 70 or 75 changes of zone which occurred in the West Los Angeles area. I considered those changes of zone as I thought a buyer or seller in the market would do.

"The next step was forming an opinion as to whether or not I felt that there was the reasonable probability of a change of zone to permit use as commercial property of the frontage along Seuplveda. I will say that in this particular study I envisioned no particular change in the property fronting on Sawtelle, so these remarks are adjusted primarily to the Sepulveda frontage, Mr. Fadem.

"The next step after having formed an opinion as to whether or not there existed a reasonable probability of a zone change within the reasonably near future with regard to January 24, 1964, was to make a search throughout the economic area that I felt to be comparable to the subject property for sales of land which was similarly situated, some of which was zoned for commercial purposes, some of which was zoned for other purposes and had after the purchase or as a condition upon which the purchase was contingent to be rezoned to permit commercial.

"And by that I indicate, Mr. Fadem, not that the entire property necessarily would be rezoned commercial, but a combination of commercial and parking to permit commercial development in the general sense of the word.

"Having made the general studies that I have just described, that is, the development, need, traffic, zone changes and so forth, I then considered the data which I had accumulated in forming an opinion under the converted use basis which I have just outlined in general detail."

said: "The testimony of Mr. Metcalfe regarding the changes of zone in the vicinity does not show with any degree of plausibility a prospective change in zone respecting the subject property from R-4 to any other use in the reasonably foreseeable future."

Upon objection by Morris' counsel, the court amended the statement and said: "Just a minute. I will cut out the 'any other use.'"

Parties then adjourned to the courtroom and the court orally instructed the jury as follows:

"In the first instance, the Court . . . must determine whether there is a reasonable probability in the reasonably near future that a zone change could be effected and the Court instructs you that the testimony of Mr. Metcalfe regarding a change of zone does not show with any degree of plausibility a prospective change in zone respecting the subject property from R-4 in the reasonably foreseeable future.

"So . . . in determining the question of . . . fair market value . . . you are not to take into consideration, unless there is evidence in addition to what is now before the Court . . . the possibility of a zone change. Have I made myself clear?"

The record shows that substantial improvements on the subject property produced a gross annual income of approximately $450,000. Mr. Metcalfe, too, testified "[t]he highest and best use of the Morris property is for the purposes for which it is presently developed, and I cannot hypothesize any other thing, such as the valuation of the land separate from the buildings, . . ."

It is undoubtedly a fair assumption that Morris would not nor would any purchaser change the physical setup of the subject property to depreciate or otherwise adversely affect its gross income or its gross income potential. It does not follow, however, that if one could rezone the property in its entirety or effectuate zoning changes for parts of it gradually or obtain zoning changes for purposes other than R-4 in respect of the unoccupied acreage included in the subject property, that the gross income would not be increased. There was an abundance of physical and commercial facts testified to by all the experts upon which the jury could have tested the validity of any opinion as to the reasonable probability of rezoning the subject property or any part or parts thereof in the near future and, if effected, whether any rezoning would have increased rather than decreased income.

■ The second error affects the voluntariness of the Zuckerman sale. As appears *infra,* a primary point of attack on the Zuckerman sale is that it was not a voluntary one. Morris complain that one vital aspect of their attempt to show it was not a voluntary sale, was frustrated when the court sustained an objection to a line of inquiry seeking to ascertain from Mr. Zuckerman whether he had taken advantage of section 1033 of the Internal Revenue Code, which permits deferred payment of taxes on the proceeds of involuntary sales.

The trial judge as appears *infra,* found *prima facie* that the sale between Zuckerman and Regents was voluntary but instructed the jury that whether it was or not was its problem.

Zuckerman had testified that it was a voluntary arms-length transaction. There was evidence from which the jury could infer the question was one of fact.

Section 1033 of the Internal Revenue Code gives a tax advantage to those who make involuntary sales. It is certainly probable that one would voluntarily make what amounts to an involuntary sale under said section for a price less than market in order to obtain benefits arising therefrom. Such a sale could have been voluntary as to Zuckerman. The evidence might have shown that he sold for less than market because of other compensatory advantages offered by section 1033. If Zuckerman did not take advantage of the benefits of said section, it would fortify his assertion that the sale was voluntary. Whether Mr. Zuckerman did or did not avail himself of the benefits of the section and all proper inferences therefrom, are important considerations in determining the question of voluntariness. The question should have been permitted.

The third error arises from the following facts:

■ The record shows that the Regents violated a pretrial order in failing to exchange full appraisal reports, a procedure we approved in *Swartzman* v. *Superior Court* (1964) 231 Cal.App.2d 195, 201 [41 Cal.Rptr. 721].

It had been established that the appraisal furnished by Regents to Morris was an abbreviated one. On cross-examination, Mr. Shelger, Regents' appraiser, admitted "The purpose of the appraisal that you have *was to provide a limited amount of information.* . . . (Italics added.)

". . . . . . . . . . . . . . .

"Q. By Mr. Fadem: That was your purpose? A. That is what I was instructed to do. Q. And it was your purpose in

preparing a short form report to only provide a limited amount of information? A. Yes.

"... . . . . . . . . . . . . .

"A. I was satisfied that the information that I had in my files and which went into the complete appraisal report that was submitted to Mr. Sparrow was adequate and complete. *I was not concerned with whether or not this was going to be adequate for you."* (Italics added.)

Addressing Mr. Sparrow of Regents' counsel, and seeking to ascertain how the breach of the pretrial order re the exchange of appraisals came about:

"THE COURT: Who were the gentlemen? MR. SPARROW: The two appraisers, Mr. Shelger and Mr. Brownell."

Sparrow testified he told the appraisers: *"I gave them no directions what to include or not include in their reports.* (Italics added.) I simply said, 'You gentlemen tell me you are aware of the practice in the County. You adhere to it.' "

Mr. Sparrow had previously testified that he had "never, . . . run across a court which directs exchange of appraisal reports. . . . Now, I inquired of both appraisers, Mr. Shelger and Mr. Brownell, as to . . . their knowledge the practice in Los Angeles . . . with reference to exchange of appraisal reports. . . . Each responded that the bare bones of an appraisal was exchanged under these circumstances, . . . ." Sparrow then testified " 'I want your report to conform according to what your understanding of the practice is, based upon your experience in Los Angeles County.' "

In respect of the above conduct the trial judge said: "Of course, I think the act—this wasn't Mr. Hadley's doing . . . whoever it was, other than Mr. Hadley, who instructed Mr. Shelger to condense his report was reprehensible."

Morris complain that this infraction of the rules was aggravated. It undoubtedly was. Shelger had testified on direct to matters not included nor alluded to in the abbreviated report delivered to Morris, but which were included in that delivered to Regents. The court instructed Morris' counsel to prepare a list of Shelger's references to the improper matters. A motion by Morris to strike the testimony not included in the abbreviated report, was granted. Relying on the strike order, Morris' counsel omitted to cross-examine Shelger on the testimony which had been stricken. Thereafter, the court reversed itself, vacated the strike order. Morris had finished cross-examination, Shelger was off the stand.

Although there is no showing that Shelger was not then available for further cross-examination on matters stricken and restored and no showing of surprise and no request for a continuance, we agree with Morris that Shelger "could no longer be effectively cross-examined. . . ."

The trial judge had designated the conduct of whoever had "instructed Mr. Shelger to condense his report . . ." as reprehensible. Morris' counsel had been instructed to and they did prepare a list of Shelger references to improper matters and the motion to strike was granted. After Shelger had left the stand the order granting the motion to strike was vacated and the jury instructed to consider the matter which had been stricken.

The breach here was more than a breach of mere form.

Morris was put at a considerable disadvantage in any attempted cross-examination of Shelger when Shelger referred and testified to matters contained in his report to the Regents which were omitted from the abbreviated report he delivered to Morris. So far as the record goes, Morris did not know of the difference in reports until the matter was disclosed in the courtroom. It would be difficult to make any effectual cross-examination of Shelger, even if it had been resumed after the trial court had in effect, by restoring the stricken portion of the report to the record, placed its judicial imprimatur on testimony so restored.

A proper exchange of appraisals is not an empty pretrial formality. Its crucial importance is illustrated in *U.S.A.* v. *Meyer* (9th Cir. July 17, 1968) 398 F.2d 66, 69-70. In *Meyer,* the court says: "The appraisers' opinions and their factual and theoretical foundation are peculiarly within each appraiser's knowledge and, to a degree, that of the party who employed him. The opposing party can obtain this information in advance of trial only by discovery. Because this material will constitute the substance of the trial, pretrial disclosure is necessary if the parties are to fairly evaluate their respective claims for settlement purposes, determine the real areas of dispute, narrow the actual issues, avoid surprise, and prepare adequately for cross-examination and rebuttal.

"The Committee on Rules of Practice and Procedure of the Judicial Conference of the United States has recently written. . . .

" ' "In cases of this character, a prohibition against discovery of information held by expert witnesses produces in

acute form the very evils that discovery has been created to prevent. Effective cross-examination of an expert witness requires advance preparation. The lawyer even with the help of his own experts frequently cannot anticipate the particular approach his adversary's expert will take or the data on which he will base his judgment on the stand. . . . A California study of discovery and pretrial in condemnation cases notes that the only substitute for discovery of experts' valuation materials is ''lengthy—and often fruitless—cross-examination during trial,'' and recommends pretrial exchange of such material. Calif. Law Rev. Comm's, *Discovery in Eminent Domain Proceedings* 707-710 (Jan. 1963) Similarly, effective rebuttal requires advance knowledge of the line of testimony of the other side. If the latter is foreclosed by a rule against discovery, then the narrowing of issues and elimination of surprise which discovery normally produces are frustrated.' 43 F.R.D. 211, 234 (1967).

''In sum, in condemnation cases full pretrial disclosure of appraisers' opinions and the details upon which they are based is required if the rules are to accomplish their purpose to 'make a trial less a game of blindman's buff and more a fair contest with the basic issues and facts disclosed to the fullest practicable extent.' *United States* v. *Procter & Gamble,* 356 U.S. 677, 682 [2 L.Ed.2d 1077, 1081, 78 S.Ct. 983] (1958).''

In our opinion, the net result of Regents' conduct, aggravated by the withdrawal by the trial court of its strike order, was that cross-examination of Shelger was improperly and prejudicially interfered with and aborted.

We proceed to other contentions of Morris:

 Morris challenged by answer, cross-complaint and objection to evidence Regents' right to condemn the subject property on grounds appearing from pleadings or clearly in the record, as follows:

A) The property was to be used for public grounds as authorized by Education Code, section 23151; Code of Civil Procedure, section 1238, subdivision 2, as said sections had been interpreted by *Church Divinity School* v. *County of Alameda,* 152 Cal.App.2d 496 [314 P.2d 209].

B) Although conceding that the wisdom of the resolution of necessity adopted by the Regents cannot be re-litigated (Ed. Code, § 23152) Morris contend the manner of its oper-

ation on a litigant may be and in this instance is unconstitutional, as it deprives Morris of procedural due process.[3]

C) No facts exist indicating that the taking of the property was necessary.

D) Morris was denied the opportunity to try the issue of public grounds or public use, because the court refused to hear evidence on the subject and on its own motion limited Morris to an offer of proof.[4]

E) The condemnation was in violation of article XXXIV of the Constitution.[5]

Fortifying these points Morris contend they made no waiver as required by sections 1254, subdivision (f) and 1255b of the Code of Civil Procedure, because their acceptance of the judgment was not voluntary and that a forced acceptance makes the section unconstitutional.

The record shows that on June 7 when Morris first requested payment of the judgment from the clerk, they eliminated from the application form the portion which requires abandonment of defenses. The clerk refused to accept such an application. Thereafter, on June 9, the application requiring waiver of defenses was filed and the portion of the judgment money, approximately $2,075,000 to which Morris was entitled, was paid to Morris.

Morris contend that Code of Civil Procedure, section 1255b deprives them of interest in the approximate sum of $145,000 per annum, if they do not withdraw the award in their favor, and actually pays the interest thereon to Regents (Code of Civ. Proc., § 1254, subd. (j).) At the same time, they say they are deprived of possession (§ 1254). Thus the statute forces them to abandon their right of appeal on all grounds except

[3]Morris' argument in this respect and the authorities cited indicate there must be fraud, bad faith or abuse or discretion. There is no evidence in the record to support this argument.

[4]In this respect, it should be noted that the court's suggestion was made in the interest of saving time; that counsel for Morris did not object thereto; and proceeded, as the approximately 40 pages of Reporter's Transcript show, to detail the evidence which Morris expected to produce in the form of an offer of proof.

When the offer had been completed, Regents' counsel objected to the evidence offered and after detailed discussion of the evidence and the law applicable thereto, the court sustained the objection.

[5]Article XXXIV, section I of the California Constitution provides in pertinent part: ''No low rent housing project shall hereafter be developed, constructed, or acquired in any manner by any state public body until, a majority of the qualified electors of the city, town or county, . . . in which it is proposed to develop, construct, or acquire the same, . . . approve such project by voting in favor thereof at an election . . . .''

the amount of award. They argue that under the circumstances there can be no voluntary acceptance and no waiver; that they actually tried to avoid a waiver, but that it was forced on them; that the sections in question amount to a deprivation of the right to appeal.

We have been cited some criminal cases on the general subject of coerced waiver, to sustain the Morris contention. No case has been cited which holds that the procedure outlined by the statutes is unconstitutional. ■ Criminal cases such as *Dorado* and *Miranda,* in respect of voluntary and intelligent waiver, have no application to a litigant confronted with a choice such as that which is provided by the condemnation statutes in question, especially when the complaining litigant has been advised from the inception of proceedings by counsel.

■ It has been held on facts parallel to those at bench that conduct equivalent to that of Morris does not constitute an involuntary acceptance. In *Mt. Shasta Power Corp.* v. *Dennis* (1924) 66 Cal.App. 186 [225 P. 877] the court disposes of the question of voluntary or involuntary payment in a situation in which the condemner paid the judgment under protest and appealed. The court said at pages 190 and 191: ''Appellant contends that its payment of the damages . . . was not voluntary. . . . Plaintiff had the option of paying . . . and taking possession or appealing from the judgment and remaining out of possession. . . . The fact that a party may find it more profitable to comply with a judgment and accept the fruits thereof than to suffer the losses incident to an appeal cannot be said to render such compliance compulsory. . . . In taking the fruits of the judgment under the authority of the statute, the plaintiff could not impose conditions upon defendants' acceptance of the money paid which are not provided by the statute. . . . Its statement, . . . that the [money] was deposited 'without prejudice to . . . its right to appeal from said judgment' is of no value in determining the question of its right to appeal, a right which is wholly dependent upon the statute.' Ordinarily the voluntary compliance with a judgment and the acceptance of the fruits thereof by a party are inconsistent with a right of appeal by such party.''

It has been squarely decided that by accepting the fruits of the judgment, Morris waived constitutionality as well as other defenses. In *Donegan* v. *City of Los Angeles* (1930) 109 Cal. App. 673 the court says at pp. 685, 686 [203 P. 912]:

■ " 'A land owner who accepts payment of damages awarded him for the taking of a portion of his land for a public highway cannot be heard to declare afterwards that the proceeding for opening such highway was void. (*Town* v. *Blackberry*, 29 Ill. 137; *Kile* v. *Yellowhead*, 80 Ill. 208; *Hartshorn* v. *Potroff*, 89 Ill. 509.)' Likewise: 'A land owner who accepts the damages awarded him for land taken in the laying out of a public highway virtually dedicates his land as a public highway, and is estopped from contesting the validity of the proceedings to take it, however defective they may be. (*Karber* v. *Nellis*, 22 Wis. 215; *State* v. *Langer*, 29 Wis. 68; *Schatz* v. *Pfeil*, 56 Wis. 429 [14 N.W. 628]; *Moore* v. *Roberts*, 64 Wis. 538 [25 N.W. 564].)' Again: 'The acceptance by a land owner of a sum awarded to him as damages for opening a highway across his land estops him from prosecuting an appeal to reverse the judgment establishing the highway.' . . . A parallel case is that of *Sherman* v. *McKeon*, 38 N.Y. 266, where it is held: 'A land owner whose land has been condemned by right of eminent domain waives his right to appeal from the judgment in the condemnation proceedings, by accepting and retaining the damages awarded to him for his property; *and this, notwithstanding the law under which the condemnation was had may be unconstitutional because it authorizes the taking of private property for other than public purposes.*' " (Italics added.)

■ Further, the questions now posed by Morris which touch on jurisdiction need not have waited for the trial to have gone to judgment.

When the trial court overruled the Morris demurrer, denied its objection to the evidence and sustained an objection to its long offer of proof, it clearly appeared that the trial court had ruled on questions involving jurisdiction and intended to proceed with the trial. At this point, the jurisdictional objections of Morris could have been tested by prohibition without any financial risk of the type complained of.

In *Harden* v. *Superior Court* (1955) 44 Cal.2d 630 [284 P.2d 9] the court said: "It may be said here that the lack of jurisdiction appears from the city's allegation that the action involved land outside its corporate limits without alleging its authority to so condemn.

"Petitioners did demur on the ground that the complaint failed to state a cause of action. It is ordinarily said that the sufficiency of the complaint will not be inquired into on appli-

cation for a writ of prohibition (41 Cal.L.Rev., 124 et seq.; *Lange* v. *Superior Court*, 11 Cal.App. 1 [103 P. 908]) and that where a demurrer is erroneously overruled, the litigant's only relief is an appeal from the final judgment. *However, when it is shown that the court, in overruling the demurrer is proceeding without jurisdiction over the subject matter of the action, prohibition may issue.''* (At pp. 636, 637.) (Italics added.) (*Rescue Army* v. *Municipal Court*, 28 Cal.2d 460, 465 [171 P.2d 8].)

We proceed now to an examination of claimed errors, other than those discussed, which could have affected the amount of the judgment.

Morris claim they did not receive a fair trial and assign as prejudicial error in this respect each and all of the following:

a) Regents' counsel prejudiced the jury with unwarranted attacks on the court and by making repeated references to matters off the record.

b) Regents falsely answered an interrogatory, misleading Morris.

c) The trial court's statements to the press prejudiced Morris.

d) Evidence of the Zuckerman sale was improperly admitted on cross-examination.

e) The Zuckerman sale was not voluntary and there was no determination by the court that it was.

Early in the trial it became clear that the trial judge had fixed convictions of the legal principles applicable to the issues before it and would not tolerate any extended discussion thereof, particularly in its construction of *County of Los Angeles* v. *Faus,* 48 Cal.2d 672 [312 P.2d 680]. Regents' counsel in cross-examining Mr. Metcalfe, expert for Morris, asked a leading question in respect of the market value of the Zuckerman property. The comparability and voluntariness of the sale to the Regents had not been previously ruled upon and established by the court.

The court, in the presence of the jury, reprimanded counsel for misconduct. Upon counsel's suggestion that he was prepared to satisfy the court, that he had been unjustly accused and castigated by the court, and that the court's remark should be withdrawn, so that he could present authorities sustaining his position, the court reiterated its reprimand and refused to hear him.

The trial encompassed six weeks. The reprimand took place early in the trial.

From the day of the reprimand to the trial's conclusion Regents' counsel and the trial judge agreed on very little. The trial judge characterized the attitude of Regents' counsel as "... obnoxious, insolent, insulting and contemptuous. ..."

The cold record discloses that Regents' counsel frequently and abrasively differed with the trial judge.

Morris seek to equate the mutual lack of hospitality by the trial judge and Regents' counsel for each other's views with the prejudicial misconduct of counsel in the case of *Love* v. *Wolf*, 226 Cal.App.2d 378 [38 Cal.Rptr. 183] and *Garden Grove School Dist.* v. *Hendler* (1965) 63 Cal.2d 141, 145 [45 Cal.Rptr. 313, 403 P.2d 721]. The situations, however, are not comparable on the facts.

The trial judge answered this alleged error when, in denying the Morris motion for a new trial, he said: "However, the court does not feel that defendants were harmed thereby, and the reverse is probably true." We agree.

The specification of error relating to off-the-record comments is illustrated by two which will be treated specifically. Regents' counsel argued to the jury: "... we are here because very obviously the defendants and the Regents of the University have not been able to agree upon a figure, ..."

Although Morris' counsel on numerous occasions was quick to object and ask for instructions to the jury on matters having even a remote complexion of impropriety, there was no objection made to the above at the time it was made.

In another instance, Regents' counsel argued:

"I am sure that Mr. Zuckerman wanted, just as sure as I am standing here, he wanted $3,500,000, ...

"I am sure, just as I am standing here, that Mr. Zuckerman was enough of a businessman to have covered all of the contingencies right down to the stamps."

No complaint was made by Morris' counsel in respect of the quoted argument, but when statements were made by Regents' counsel in respect of nonpayment of penalties, a subject on which there had been no evidence, which immediately followed the above excerpt, Morris' counsel objected and obtained a correcting instruction from the trial court.

Most of the so-called off-the-record statements complained of were understandable misconstructions of the evidence, suggestions as to what court rulings had been and in each instance, where they were incorrect as referred to or where

there was a mistaken suggestion, objection was made and correcting instructions were forthwith and emphatically given to the jury.

The trial judge at the outset of the trial instructed the entire jury panel that "you must not decide the case on your likes or dislikes of counsel or anybody else" and repeatedly advised the jury throughout the trial that counsels' statements and arguments were not evidence.

The record is a long one and it is quite clear that the jury was amply educated by the trial court and respective counsel as to what was evidence. It is bromidic to say that one cannot unring a bell. However, the reporter's transcript here shows an unusual attention by respective counsel to any off-the-record statements calculated to give the litigation a complexion for one side or the other, and quick, rigorous and thorough admonition by the court, when such statements were made in the presence of the jury. We are satisfied no off-the-record statements constituted prejudicial error.

 Morris contend they were misled to their prejudice because in response to their interrogatory, number 20, to wit: "How much did the Regents pay for Park Vista?" The Regents answered "$3,500,000." Morris argue that the reply was false and misleading and contend that the actual payment made to Zuckerman was $3,500,000 plus fees and costs which are ordinarily paid by the seller, such as broker's commission, title insurance premiums, pay-off penalties, revenue stamps, escrow fees and other costs.

The trial judge, in a memo denying a motion for a new trial, points out:

"In answer to defendants' interrogatories 2 and 3, the plaintiff annexed Exhibit 2. This exhibit disclosed to defendants' excerpts from the Minutes of the Meeting of the Committee on Finance of the Regents on July 12, 1963, (sixth page of the exhibit) respecting the acquisition of Park Vista Apartments, in which it is stated, '. . . the seller has agreed to absorb all penalties involved in the repayment [sic] of loans presently outstanding on the property. Also, Coldwell, Banker has indicated it will cut its broker's commission in half.'

"On page 10 the same Committee Minutes of June 21, 1963, again relating to Park Vista, 'The owner has indicated that he has no desire to sell this property, but that after July 1, 1963, he would consider an offer of $3,500,000 net to him. Estimated costs, including broker's commissions, penalties to

prepay existing loans, title insurance, and other closing costs total in the vicinity of $100,000.'

"On page 12 same Committee Minutes on May 17, 1963, again re Park Vista, '10. Treasurer Hammond reported . . . It was his understanding that the owner will be asking approximately $3,500,000 for the property, plus more than $90,000 in costs and prepayment penalties.'

"While it did not turn out to be true that the seller 'agreed to absorb all penalties involved in the repayment of loans presently outstanding on the property,' the defendants had notice that plaintiff was going to pay considerable sums of money in connection with the transaction in addition to the $3,500,000 to paid to Zuckerman."

In denying the motion for new trial, the trial judge said: "[T]he answer is *literally* true."

We are satisfied that Morris were in no way misled or prejudiced by the answer although we consider it was not true.

This conduct of Regents is not commendable. However, the details of the full purchase price were known by Morris and those details were exposed to the jury. Most experienced trial counsel would agree that such exposure was a plus in favor of their clients.

 Morris argue they did not receive a fair trial because of press stories during the trial. This is completely without merit.

When the panel was sworn and after 12 prospective jurors were called to the box, the court made a number of general statements addressed to the entire panel, and among them was the following:

"Now, there has been some newspaper notoriety about this case, and also there has been something appear on television; not necessarily about [t]his precise case, but about the University of California seeking to acquire property. The City Council of the City of Los Angeles, without any justification, adopted a ruling and it has been published in the newspapers.

". . . Did anybody of you read anything in the newspapers at all about this particular condemnation case? If you did hold up your hand and keep your hands up, please, until I can call your names."

All jurors who raised their hands were adequately interrogated.

At a later stage, again during the process of examination, the court said:

"I know that you would be critical of me if you thought that I took any evidence on the outside or got anything from the newspapers or over the radio or television or by word of mouth from anybody else, and you would be entitled to criticize me severely. . . . I want you to consider yourselves as if you were all jurors at the present time, and observe the admonition that I have given to you.

"If anyone should attempt to address you on the subject of this case, . . . report it to me and I will see that matter is taken care of. . . ."

After the trial had started and the taking of evidence was well under way, the court on a number of occasions, further admonished the jury on the subject of the press.

The record shows nothing to indicate even remotely that the court or the jury was in any manner influenced by newspaper comment.

 Morris assert that evidence of the sale of the Zuckerman property was prejudicially elicited in the first instance by Regents' counsel on cross-examination of Metcalfe. Testimony already in the record indicated that the Morris and Zuckerman properties were comparable. The court, however, had not, before the question was put to Metcalfe, ruled that the sale was either comparable or voluntary.

The sales price of the Zuckerman property and the question of whether the sale to the Regents was voluntary, was important and decisive evidence. The trial judge in his memo denying a new trial, said among other things: A comparison of the subject property with the Zuckerman property, the income of the respective properties, the selling price of Park Vista, and a view of the properties no doubt had the greater influence on the jury than did the opinions of the valuation witnesses. And this is true as to the court."

Metcalfe had testified at length on direct. On cross-examination asked by Regents' counsel: "Q. So that you then informed yourself that on August 16th of 1963 Mr. E. K. Zuckerman agreed to sell the Park Vista Apartments to the University of California for the sum of $3,500,000, did you not?"

The trial court sustained the objection, rebuked Regents' counsel and in the presence of the jury, assigned it as misconduct. Relying on *Faus, supra,* the trial judge refused to hear any argument from Regents' counsel.

Morris cite the enactment of title 7.1 of the Code of Civil Procedure to fortify their argument that the question was improper in any event. This legislation, however, was to be effective after December 17, 1965. (Section 6, Stats. of 1965, ch. 1151, p. 2907.)[6]

Title 7.1, i.e. sections 1268 through 1272.4 of the Code of Civil Procedure appear identical to article 2 of division 7 chapter 1 of the Evidence Code, i.e. sections 810 through 822.

Although the Evidence Code was enacted in 1965, its operative date was January 1, 1967. However, the Legislature apparently desired to have these particular sections become effective promptly. They therefore enacted title 7.1 with the proviso that it was to become operative only if the proposed Evidence Code was enacted and further provided that it ''is repealed at the time [the identical provisions in the Evidence Code] becomes operative.'' (Section 7 of Stats. 1965, ch. 1151.)

It would therefore appear that cases tried after September 17, 1965 (the effective date of statutes enacted at the regular session of the 1965 Legislature) would be governed by title 7.1 until January 1, 1967. After the latter date they would be governed by the identical sections of the Evidence Code.

The court in *County of Los Angeles* v. *Faus, supra,* at page 676 says: ''*In a condemnation proceeding, is evidence of the prices paid for similar property in the vicinity, including prices paid by the condemner, admissible on (a) direct examination, and (b) cross-examination of a witness who is presenting testimony on the issue of the value of the condemnee's property?*

''*Yes.* Section 1872 of the Code of Civil Procedure provides: 'Whenever an expert witness gives his opinion, he may, upon direct examination, be asked to state the reasons for such opinion, and he may be fully cross-examined thereon by opposing counsel.' ''

In *Faus,* on page 679, the court overrules, among other cases, *People* v. *La Macchia,* 41 Cal.2d 738 [264 P.2d 15].

The references in the above excerpt from *Faus* to Code of Civil Procedure, section 1872, and the generally accepted fundamental right of cross-examination of an expert raises a question in our mind as to whether *Faus,* although clearly overruling *La Macchia,* changes the general rule on cross-

---

[6] ''Section 6. This act does not apply to any action or proceeding that has been brought to trial prior to the effective date of this act.''

examination expressed in *La Macchia* at page 745: "Upon cross-examination, however, such evidence is admissible for the sole purpose of discrediting the opinion of the witness [citing cases], but it may not be considered for the purpose of fixing the value of the land in dispute."

We think the question was proper. It was predicated upon facts which the Regents in good faith expected to show and did show and it was within the scope of proper cross-examination.

We now treat the question of voluntariness.

After the incident on cross-examination above referred to, Zuckerman testified that he had voluntarily sold his property to the Regents in an arms-length transaction.

In respect of the Zuckerman testimony, Morris contend and the trial court agreed that by reason of matters testified to by Zuckerman on cross-examination, the evidence on the subject of voluntary sale was conflicting. The question of whether the Zuckerman sale was voluntary was submitted to the jury.

Morris' criticism in this regard is that the court should have determined the question of voluntariness in the first instance before submitting it to the jury. We think the court did.

The trial judge said:

"In this particular, there is evidence that might be considered both ways on the subject, as to whether this sale by Zuckerman to the University was a fair open market transaction. . . .

"I believe that the court should permit this testimony to come in, but I also instruct you again that you are the ones to determine this question when you go to the jury room . . . and consider in connection with . . . your final determination . . . whether this was a fair open market sale or whether there was some such degree of compulsion in it as would detract from its being a fair open market sale.

"Now, is that clear to all of you?

"If I admit this testimony, you are not bound by my decision. You make your own decision at the proper time.

"Is that clear? All right."

Morris' counsel did not object to this procedure. The proposed instructions to the jury were discussed at length with counsel by the court. The court submitted a proposed instruction on the question of voluntary sale. Morris' counsel suggested a change. It was added. The instruction as so corrected,

was given.[7] At no time did Morris argue that the court had not made a prima facie determination that the sale was neither comparable nor voluntary.

In arguing the matter before the jury, Morris' counsel reiterated its approval and acceptance of the court's procedure on this point: "Now, if we knew the price and if the people in the market place could be influenced in their actions by knowing it, it still suffers from its lack of voluntariness. Now, the condemnor has presented this sale as a comparable sale; therefore, the burden is theirs. I think the Court will instruct you that the burden is upon them to prove this was a voluntary sale, the purchase which they themselves made."

Thereupon the following took place:

"MR. HADLEY: Just a moment. For the record, and for the record only, your Honor, this is an improper argument, and we respectfully ask the Court to admonish the jury to disregard the same.

". . . . . . . . . . . . . .

"THE COURT: I am saying I am denying your request, because I am going to instruct the jury the burden was on the plaintiff to prove by a preponderance of the evidence that this sale was a voluntary sale under the conditions mentioned."

Regents' counsel had in chambers objected to that portion of the instruction which placed the burden of proving voluntariness of sale on the Regents.

In the context of the above record we find no error of which Morris can complain.

In a supplemental brief Morris argue that in their motion for a new trial they called the court's attention to the principle of additur and urged the trial court to apply it in respect of their then pending motion.

---

[7] "With respect to the question whether the sale by Zuckerman to the University was sufficiently voluntary to constitute an open market sale so that the amount for which the property was sold would be a reasonable index of its value, there has been a conflict in the evidence.

"You must resolve that conflict. If you find that the sale was sufficiently voluntary, you may consider the price at which the property was sold in determining the fair market value of the Morris properties on January 24, 1964. If you find it was not sufficiently voluntary, then you may not consider the price of the Zuckerman property in determining the fair market value of the Morris property.

"The plaintiff has the burden of proving by a preponderance of the evidence that the sale by Zuckerman to the Regents was sufficiently voluntary to be a reasonable index of its value."

"Given on Court's Motion
Arnold Praeger, Judge."

The trial judge citing *Dorsey* v. *Barba* (1952) 38 Cal.2d 350 [240 P.2d 604], which was then the law, said that it had "no power to make addittur a condition to granting or denying a motion for a new trial. . . ."

*Dorsey* has since been overruled in *Jehl* v. *Southern Pac. Co.* (1967) 66 Cal.2d 821, 828 [59 Cal.Rptr. 276, 427 P.2d 988] and section 662.5 has been added to the Code of Civil Procedure, which expressly permits an order addittur.

Our courts have held that when there is a change in procedural law while an action is still pending, the new law should be applied. (*County of Los Angeles* v. *Faus, supra; Heron* v. *Bray* (1932) 122 Cal.App. 79, 83 [9 P.2d 513]; *Rosefield Packing Co.* v. *Superior Court* (1935) 4 Cal.2d 120, 122 [47 P.2d 716]; *Arques* v. *National Superior Co.* (1945) 67 Cal. App.2d 763, 778 [155 P.2d 643]; *Estate of Giordano* (1948) 85 Cal.App.2d 588, 592 [193 P.2d 771].)

In *Faus, supra,* the court at page 680 states the doctrine as follows: "The law is settled that there is no constitutional objection to an appellate's court's making a choice for itself, in overruling an earlier decision, whether the new rule declared by it shall operate prospectively only or apply retrospectively. (*Great Northern Ry. Co.* v. *Sunburst Oil & Refining Co.,* 287 U.S. 358, 363 et seq. [77 L.Ed. 360, 365, 53 S.Ct. 145, 85 A.L.R. 254]; cf. Traynor, J., *Sutter Basin Corp.* v. *Brown,* 40 Cal.2d 235, 249 [253 P.2d 649]; *People* v. *Ryan,* 152 Cal. 364, 369 [92 P. 853]; *People* v. *Maughs,* 149 Cal. 253, 263 [86 P. 187]; 17 Minn. L.Rev. 811; 28 Ill. L.Rev. 277; 11 N.C.L.Rev. 323.)

"The determination by the court is dependent upon the equities in each case. It is the general rule that a decision of a court of supreme jurisdiction overruling a former decision is retrospective in its operation and that the effect is not that the former decision was bad law but that it never was the law."

The specific portion of Finding VIII herein-before quoted should be and the trial court is directed to strike it and new findings should be made, and the trial court is directed to make new findings, to provide for an adjustment between the parties on all the items herein-before discussed.

The judgment is reversed solely as to the issue of damages and the trial court is directed to grant a new trial on the issue of damages. In all other respects the judgment is affirmed.

Costs on appeal to appellants and respondents, B. R. and Estelle Morris.

Herndon, J., and Fleming, J., concurred.

A petition for a rehearing was denied November 13, 1968, and the petition of the defendants and appellants for a hearing by the Supreme Court was denied December 11, 1968. Peters, J., was of the opinion that the petition should be granted.