[L.A. No. 29940. In Bank. Apr. 28, 1972.]

IRA NESTLE et al., Plaintiffs and Appellants, v.
CITY OF SANTA MONICA, Defendant and Respondent.

**COUNSEL**

Fadem & Kanner, Michael M. Berger, Jerrold A. Fadem and Gideon Kanner for Plaintiffs and Appellants.

Richard L. Knickerbocker and Christina New, City Attorneys, Brill, Hunt, DeBuys & Burby, MacDonald, Halsted & Laybourne, Mitchell L. Lathrop, and Milnor E. Gleaves for Defendant and Respondent.

Roger Arnebergh, City Attorney (Los Angeles), Milton N. Sherman, Assistant City Attorney, and James H. Pearson and Ronald J. Einbodin, Deputy City Attorneys, as Amici Curiae on behalf of Defendant and Respondent.

## OPINION

**MOSK, J.**—Appellants are 37 of over 700 plaintiffs who brought suit against the City of Santa Monica ("defendant") for injuries alleged to have been suffered by virtue of defendant's operation of the Santa Monica Airport.[1] This action vividly demonstrates the difficulties encountered in engrafting traditional common law theories of recovery onto proceedings involving injuries peculiarly contemporary in nature. (See Kramon, *Noise Control: Traditional Remedies and a Proposal for Federal Action* (1969) 7 Harv. J. Legis. 533; Malley, *The Supersonic Transport's Sonic Boom Cost: A Common Law Approach* (1969) 37 Geo.Wash.L.Rev. 683.) Despite the dilemma, however, we recall Justice Cardozo's admonition that "[t]hose who would earn [the common law's] best rewards must make their knowledge as deep as the science and as broad and universal as the culture of their day." (Selected Writings of Benjamin Nathan Cardozo (Hall ed. 1947) p. 88.)

Plaintiffs instituted this action to recover for both property and personal injury damages caused by defendant's operation of the airport. Specifically, they claim that vibration, fumes, and noise emanating from jet aircraft landing and taking off at the airport caused damage to their property, interfered with the free enjoyment of their property and resulted in physical pain, suffering and emotional disturbance. They asserted four theories of recovery: (1) inverse condemnation, (2) nuisance, (3) negligence, and (4) zoning violations.

At trial the parties agreed to a procedure by which the court, immediately prior to the commencement of trial, would rule on the legal sufficiency of counts II, III, and IV. The court reserved its ruling on the nuisance theory (II) and held that the counts for negligence (III) and zoning violations (IV) failed to state causes of action. The court denied appellants leave to amend the latter two counts.

Trial was commenced with both parties presenting evidence as to the value of appellants' properties both before and after the stipulated valuation date of July 1, 1966. Appellants produced expert opinion that the value of the 10 parcels had suffered diminution due to jet noise, fumes and vibration. The amount of decrease, according to appellants' witness, ranged from 4 percent to 20 percent of the pre-July 1 value of the respective parcels. Furthermore, appellants introduced substantial evidence that the noise

---

[1]The trial court adopted a procedure by which plaintiffs selected 10 representative parcels purportedly affected and tried the issues relating to those 10 parcels separately. The specific plaintiffs involved with parcels 1 through 10 will be hereinafter referred to as "appellants," whereas the entire class of plaintiffs will be referred to as "plaintiffs."

to which the homeowners have been subjected is "intolerable" and "monstrous" and "untenable" for human habitation. Defendant's appraiser, utilizing the same general approach of determining values before and after July 1, concluded that none of the properties had been diminished in value as of that date by exposure to jet noise, fumes, and vibration.

After trial, the court found for defendant on count I (inverse condemnation), concluding that appellants had failed to establish that their properties had been damaged. The court then ruled that appellants' count II for nuisance failed to state a cause of action. Thereupon judgment was entered for defendant on the inverse condemnation count and counts II, III, and IV were dismissed.

On appeal, appellants' principal contentions are: (1) the evidence is not sufficient to support a judgment for defendant on the inverse condemnation action; (2) appellants suffered prejudicial error when counsel for defendant failed to comply with the court's pretrial order requiring a complete exchange of appraisal reports; and (3) the trial court erred in dismissing counts II, III, and IV.

*Inverse Condemnation*

Appellants' two contentions in regard to the cause of action for inverse condemnation—insufficiency of the evidence and unfair exchange of appraisal reports—are necessarily interlaced: even if the evidence were otherwise sufficient to support a judgment for defendant, if defendant failed to comply with the trial court's mutual exchange order, appellants may have been handicapped in cross-examining defense witnesses and in introducing their own evidence. Full exchange of reports might, in such circumstances, have enabled appellants to elicit testimony from which a reviewing court could conclude there was insufficient evidence to support the judgment.

In resolving the issue of the sufficiency of the evidence, we are bound by the established rules of appellate review that all factual matters will be viewed most favorably to the prevailing party (*Leming* v. *Oilfields Trucking Co.* (1955) 44 Cal.2d 343, 346 [282 P.2d 23, 51 A.L.R.2d 107]; *Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157]; 6 Witkin, Cal. Procedure (2d ed. 1971) § 245, at p. 4236) and in support of the judgment (*Waller* v. *Brooks* (1968) 267 Cal.App.2d 389, 394 [72 Cal. Rptr. 228]). All issues of credibility are likewise within the province of the trier of fact. (*Estate of Teel* (1944) 25 Cal.2d 520, 526 [154 P.2d 384].) "In brief, the appellate court ordinarily *looks only at the evidence supporting the successful party, and disregards the contrary showing.*" (6 Witkin, Cal. Procedure, *supra,* § 249, at p. 4241.) All conflicts, therefore,

must be resolved in favor of the respondent. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

Cognizant of these rules controlling appellate review, we now turn to the evidence to determine whether it was sufficient to sustain the court's decision. Appellants, in presenting their inverse condemnation case at trial, essentially offered two categories of testimony: first, evidence as to the existence of excessive noise levels near the airport; second, evidence as to the diminution in the value of the homeowners' properties. At the onset it must be noted that the first category of evidence was employed in order to demonstrate the existence of the ultimate fact of a decrease in property value. It would appear that appellants could not rest solely on even massive and uncontradicted evidence of excessive noise levels occasioned by the use of jet aircraft to prove a decrease in property value.[2] In any event, appellants' evidence on excessive noise level was not unchallenged. Dr. Robert L. Watson, Jr., an ear, nose and throat specialist, testified that none of the 15 individuals he examined suffered any hearing loss. From this the trial court could properly infer that the noise level was not excessive and accordingly did not diminish the value of appellants' land. Dr. Watson also testified that a noise exposure of 110 decibels over a time period of 150 seconds per day at intervals of 20 seconds each, over a three-year period would not cause hearing loss.[3] Similarly, from such testimony the trial judge could have concluded that such occasional noise increases were insufficient to cause property damage.

[2]We do not reach the issue of whether, in view of the advancing state of medical and scientific knowledge in this regard, excessive noise levels might not be sufficient, standing alone, to establish a prima facie case for nuisance or to prove the existence of personal injuries due to hearing loss, even though it might be insufficient to establish the "taking" required in an inverse condemnation cause of action. (Compare Kramon, *supra,* pp. 538-544, with Spater, *Noise and the Law* (1965) 63 Mich.L.Rev. 1373, 1385-1396, 1406-1407.)

[3]The relevancy of the 110 decibel figure becomes meaningful in light of the data compiled by appellants on the noise standards formulated by several governmental agencies. However, even those statistics do not provide full support for the contention that 110 decibels is necessarily excessive noise sufficient to cause injury. For example, standards originally established pursuant to the federal Walsh-Healy Public Contracts Act (41 U.S.C. § 35 et seq.) did state that a maximum of 85 decibels of *steady* noise is permissible. However, *occasional* heights of 110 decibels are not considered unsafe. (33 Fed.Reg. No. 184, Sept. 20, 1968, at pp. 14258-14260.) Furthermore, current regulations permit exposures of one quarter hour per day of 115 decibels. (41 C.F.R. § 50-204.10, Table I.) *Occasional* exposure of 115 decibels is likewise allowed pursuant to the Noise Control Safety Orders of the State Division of Industrial Safety even though constant eight-hour exposure of 90 decibels is considered the maximum permitted for safe and healthy working conditions. (Tit. 8, Cal. Admin. Code, § 3872, subd. (a), at p. 432.123.) Finally, the Department of Aeronautics has established a maximum of 65 decibels. Such level, however, is not computed on the basis of infrequent blasts of noise but upon a complicated formula for averaging noise levels for a 24-hour period. (Tit. 4, Cal. Admin. Code, § 5012, at p. 396.)

While Dr. Watson's testimony alone creates a factual conflict with the impressive scientific data submitted by appellants on the subject of the level of noise near the airport, defendant also introduced a vast quantity of evidence on the ultimate issue of property damage. Elbridge Tucker, a member of the American Institute of Real Estate Appraisers, who has a master's degree in agricultural economics, testified for more than four days on the value of the properties in question. Cross-examination took another three days. This was followed by both redirect and recross.

Mr. Tucker painstakingly provided testimony on each of the 10 representative parcels, concluding that none suffered any diminution in value as a result of the operations of jet aircraft. Whenever applicable, he described the property, its topography, the access streets, the availability of utilities, the uses for which it was zoned, the improvements made on the property, the chronology of any remodeling of those improvements and the condition of the property. Finally, he testified as to the result of the comparable sales approach he employed in appraising the property.

For example, with respect to parcel 6, his conclusions were "based on sales over a period of time, on sales occurring from . . . two and a half years prior to the middle of 1966 and about the same time following, or perhaps more likely two years following, [in which he] found no influence on the market from jet operations during that period of time." With regard to parcel 7, Mr. Tucker testified: "My opinion was developed on the basis of the sales in the particular tract, plus the study of sales in other areas, plus the other basic investigations which I made relating to market activity and price of residences in the general area. All of my investigation was used as a basis for developing this final opinion of value." At the close of his testimony on the 10 parcels, he explained the general method by which he reached the conclusion of no property damage. That process, in part, is set forth in the margin.[4]

---

[4]Tucker testified as follows: "[My opinion that none of the properties in question has suffered any damage from the operation of jet aircraft during the applicable period] was based on the studies that I have enumerated here, including rather general studies of the residential real estate market over an appropriate period of time in Southern California—six counties—in Los Angeles County, in the Westchester-Santa Monica area. I studied the build-up of residential housing, the rate of sales as indicated by deed recordings, by building as indicated by permits for single family residences over a period of a year, as indicated by trust deed recordings. All of those show activity in the real estate market.

"I investigated the rate of foreclosures over several years; investigated interest rates as they applied to single family residences from several sources. I secured something like 850 sales, most of those in the Airport area—almost 700 of them; confirmed something like 165 or 75 or 80 sales, most of those in the Airport area; analyzed the sales for availability; reviewed a number of multiple listing sheets that showed offers and sales dates, or reported sales dates of a number of properties for several years, both in and out of the Airport area, to discover the time required to

■   Applying the general principles of appellate review set forth previously to the evidence proffered by defendant, we conclude there was substantial evidence to support the judgment for defendant on the inverse condemnation count.

Appellants next insist that defendant failed to comply with the court's pretrial order requiring an exchange of complete appraisal reports. Even though we have concluded that there was substantial evidence to support the judgment, the failure to fairly exchange such reports could infect the amount and quality of the evidence adduced. Accordingly we inquire into the nature of the order and into any violation.

In its first pretrial conference order, the court required the parties to submit for exchange the appraisal reports upon which they intended to rely at trial.[5] Counsel ostensibly exchanged their respective reports. However,

---

sell, or the elapsed time between the listing date of a property and the reported selling date of that property, in both the Airport and non-Airport areas.

"I was able to confirm a number of sales and resales, and in practically all cases the resale was at a significantly higher level of value than the original sale for the individual property. A number of those increased in price were caused in part by some modifications, renovations, improvements of the property, but not all of them. And those that had some renovation or improvement did not appear to account for it entirely.

"I looked at the trend in prices in the area. I studied the estimated market price of several houses, six or eight, in the general area of the Santa Monica Airport. Three of them were in the general area of the Santa Monica Airport; two northwest; and one to the east; and the others a little further distance away. And comparing those with the same type of data for a larger number of homes for which market price estimates were made periodically by lending institutions, builders, and others that were interested in keeping up with the current real estate market.

"These studies showed a slow-down in the activity of real estate sales—that is, the volume in Southern California, Los Angeles County in the vicinity of the Airport. The similarity of those trends was quite striking.

"I considered the interest rates that were available. I took notes of the loan to sale price ratio in a number of confirmed sales to discover if there was a lack of financing in the airport area that might dampen down sales activity or sales price. I inquired of a number of lenders as to their attitude regarding loans in the airport area, took notes of the tight money situation.

"On these I developed my final estimate of value of subject parcels."

[5]The order recited in part: "The parties are ordered to file appraisal reports upon which they intend to rely at the time of trial, if any, with the clerk . . . . If any party intends to have an owner or any witness, other than the appraisers whose appraisal reports are to be submitted, testify in this case with respect to valuation, such party shall also file with the court on the same date the name of such person, his opinion as to valuation, and all factual data, not otherwise submitted, upon which such opinion is based, including market data, reproduction studies, and capitalization studies, in as much detail as practicable . . . . Except as set forth herein, and except for the purposes of rebuttal, the parties will not be permitted to call any witness to testify on direct examination to an opinion of value, a sale, a reproduction study or capitalization study, unless submitted to the court as set forth above.

"In the event a party subsequently discovers any information which should have

cross-examination of Mr. Tucker, defendant's appraiser, revealed that the witness had testified to matters which were not included in the exchanged reports.

We begin by emphasizing the value of such discovery practice to a full exploration of the issues at trial. ■ Trial courts should compel the pretrial exchange of appraisal reports in order that counsel might have sufficient information to prepare for trial. Such a procedure not only increases the likelihood of more expeditious proceedings by making requests for continuances less compelling, but elimination of trial surprises is likely to produce a more salutary result.

As the court stated in *Regents of University of California* v. *Morris* (1968) 266 Cal.App.2d 616, 631 [72 Cal.Rptr. 406], "A proper exchange of appraisals is not an empty pretrial formality. Its crucial importance is illustrated in *U.S.A.* v. *Meyer* (9th Cir. July 17, 1968) 398 F.2d 66, 69-70. In *Meyer* the court says: 'The appraisers' opinions and their factual and theoretical foundation are peculiarly within each appraiser's knowledge and, to a degree, that of the party who employed him. The opposing party can obtain this information in advance of trial only by discovery. Because this material will constitute the substance of the trial, pretrial disclosure is necessary if the parties are to fairly evaluate their respective claims for settlement purposes, determine the real areas of dispute, narrow the actual issues, avoid surprise, and prepare adequately for cross-examination and rebuttal.' "

■ Certainly if the pretrial order is to be effective the court must be vigilant in compelling compliance. (See *Swartzman* v. *Superior Court* (1964) 231 Cal.App.2d 195, 203-204 [41 Cal.Rptr. 721].) However, it is equally true that counsel must call to the court's attention any material failure to comply (cf. *Regents of University of California* v. *Morris, supra,* 266 Cal.App.2d 616, 630) and must do so forthrightly. While we do not prescribe a rule requiring a motion in a specific form or manner in order to inform the court of any departure from the pretrial order for the purposes of preserving the error on appeal, we do note that here counsel for appellants made their "objections" in an ambiguous and circuitous manner, if at all. Counsel did not request a continuance in order to study evidence introduced but allegedly not exchanged. Counsel did not move to strike the testimony giving rise to the issue of compliance. Nor did they make a request

been submitted as set forth in the preceding paragraph, and desires in good faith to use the information at time of trial, he must immediately notify the other party to this effect, and provide the other party with the said information, and show good cause to the court . . . that he should be permitted to use such information at the trial."

for exchange of additional information on which the appraiser purportedly based his testimony and with which counsel was not originally provided.

Instead, between opposing counsel and the trial judge there was a lengthy colloquy in which appellants failed to specify any objection to the exchange procedures. In fact, counsel for defendant offered to recess if appellants desired, in order that they might obtain any materials alleged to have been excluded and necessary for continued cross-examination. Appellants did not take advantage of this offer.[6]

The material withheld included a chart relating comparable sales data which had been supplied in a form uncorrelated to the parcels involved in the litigation, descriptions of the interior of the 10 parcels, comparable sales data developed after the appraisal report was deposited in court, photographs, some miscellaneous charts and graphs and certain marginal notes obliterated in the copy sent to counsel for appellants. It is undeniable that the court's pretrial order did not authorize defendant to engage in a process of selecting certain items for exchange and withholding others to its advantage. ■ While it appears that defendant resorted to unilateral selectivity in the exchange, the trial court is in the best position to determine a violation of a pretrial order and whether such violation was prejudicial.

Defendant tried to clarify the issue of compliance on several occasions; in each instance appellants avoided direct confrontation. At the close of trial when defendant moved the court for a ruling on its compliance, one of appellants' attorneys stated he did not "consider such a motion to have any legal basis." The trial court, after recognizing that appellants had at no time moved to strike any testimony, noted that it was "not unusual that certain statements and actions are taken but never pursued ultimately." ■ On the state of the cloudy record we can only conclude the trial court ruled that either defendants did not violate the pretrial order or that appellants were no longer asserting error. Either ground compels us to uphold the court's determination.

---

[6]Compare, for example, the manner in which objections were made in two cases cited by appellants, *Regents of University of California* v. *Morris, supra,* 266 Cal. App.2d 616, 630, and *Sacramento, etc. Drainage Dist.* ex rel. *State Reclamation Bd.* v. *Reed* (1963) 215 Cal.App.2d 60, 67-68 [29 Cal.Rptr. 847], mod. on other grounds, 217 Cal.App.2d 611 [31 Cal.Rptr. 754]. In *Morris,* counsel made a formal motion to strike. In *Reed* counsel moved for complete exclusion of certain testimony; the court "ruled in favor of a kind of limited admissibility"; and the Court of Appeal concluded that by virtue of the formal motion before the ruling on limited admissibility counsel had objected sufficiently at trial to preserve the issue on appeal. Here, however, there was never a formal motion of any kind by appellants, and any objections could most tolerantly be characterized as imprecise.

*Nuisance*

Plaintiffs' second count asserted liability predicated on a nuisance theory. Defendant claimed at pretrial that plaintiffs had failed to state a cause of action for nuisance. At an in-chambers discussion immediately prior to trial, defendant argued that the count was barred by the rule of governmental immunity provided in Government Code section 815. A ruling was reserved on the issue until after trial and then, concluding that section 815 precluded government liability for nuisance, the court dismissed the nuisance action for failing to state a cause of action.

By treading in the murky waters of governmental tort immunity the parties immerse us once again in an aspect of the law described a half century ago as "one of the mysteries of legal evolution." (Borchard, *Governmental Responsibility in Tort* (1924) 34 Yale L.J. 1, 4.) Traditionally in this state a municipality was held liable for creating or maintaining a nuisance even though engaged in a governmental activity. (See, e.g., *Phillips* v. *City of Pasadena* (1945) 27 Cal.2d 104, 106 [162 P.2d 625], and cases cited therein; see also *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 219 [11 Cal.Rptr. 89, 359 P.2d 457].)

In more recent times, however, both the courts and the Legislature created a multitude of exceptions to the general rule of immunity in some areas and to the general rule of liability in others. In *Muskopf* v. *Corning Hospital Dist., supra,* 55 Cal.2d 211, 216, we recognized that the distinctions were "without rational basis" and operated "so illogically as to cause serious inequality." Accordingly we held in *Muskopf* "that the doctrine of governmental immunity for torts for which its agents are liable has no place in our law" (*id.* at p. 221) and "must be discarded as mistaken and unjust" (*id.* at p. 213). (See also *Lipman* v. *Brisbane Elementary Sch. Dist.* (1961) 55 Cal.2d 224 [11 Cal.Rptr. 97, 359 P.2d 465].)[7]

In *Muskopf* we found that the courts were empowered to abrogate the common law rule of immunity and we did so. However, we indicated that the scope of tort liability of public entities could be determined by the

---

[7]The Law Revision Commission in its recommendations to the Legislature on the subject of governmental immunity characterized the need for comprehensive legislation in the area as follows: "Prior to the *Muskopf* and *Lipman* decisions, extensive legislation relating to the subject of governmental liability or immunity had been enacted. This legislation expresses a variety of conflicting policies. Some statutes create broad immunities for certain entities and others create wide areas of liability. Some apply to many public entities and others apply to but one. In some cases, statutes expressing conflicting policies overlap. Even where statutes impose liability on public entities, they do so in a variety of inconsistent ways." (Recommendation Relating to Sovereign Immunity, 4 Cal. Law Revision Com. Rep. (Jan. 1963) pp. 803, 807.)

Legislature. (See *id.* at p. 218; see also Van Alstyne, Cal. Government Tort Liability (Cont. Ed. Bar 1964) § 4.4 at p. 99.) Following our *Muskopf* decision the Legislature enacted section 22.3 of the Civil Code, euphemistically known as the Moratorium Act (Stats. 1961, ch. 1404, p. 3209; see Van Alstyne, *supra,* §§ 4.16-4.21). The statute reinstituted the common law prior to *Muskopf* for a two-year period. (See *Corning Hospital Dist.* v. *Superior Court* (1962) 57 Cal.2d 488 [20 Cal.Rptr. 621, 370 P.2d 325].) During the hiatus created by the Moratorium Act an extensive study of governmental tort liability was undertaken by the California Law Revision Commission. (See A Study Relating to Sovereign Immunity, 5 Cal. Law Revision Com. Rep. (Jan. 1963) p. 1; Recommendation Relating to Sovereign Immunity, 4 Cal. Law Revision Com. Rep. (Jan. 1963) *supra,* pp. 803, 807-813.) The California Tort Claims Act of 1963 (Stats. 1963, ch. 1681, p. 3266; Gov. Code, § 810 et seq.) was largely the product of that study. (See Van Alstyne, *supra,* § 5.3, at p. 120.)

In section 815 of the Government Code, the Legislature declared the general principle of governmental immunity envisioned by the comprehensive 1963 act: "Except as otherwise provided by statute: (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person."

Thus the Legislature erected as its policy cornerstone a bar against governmental liability "except as otherwise provided by statute." ■ The Senate committee comments make clear that the Tort Claims Act itself does not provide for governmental liability for nuisance: "[T]here is no section in *this* statute declaring that public entities are liable for nuisance, even though the California courts have previously held that public entities are subject to such liability even in the absence of statute. Under this statute the right to recover damages for nuisance will have to be established under the provisions relating to dangerous conditions of public property or under *some other statute* that may be applicable to the situation." (Legislative Committee Comment—Sen., Gov. Code, § 815; italics added.) Therefore liability, if it exists, must be authorized by other statutory provision.

Prior to the 1963 act, several cases emphasized that section 3479 of the Civil Code provided a viable statutory basis for governmental liability and avoided a defense of sovereign immunity.[8] Thus, in *Vater* v. *County of*

---

[8]Section 3479 provides: "Anything which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, or unlawfully obstructs the free passage or use, in the customary manner, of any navigable lake, or river, bay, stream, canal, or basin, or any public park, square, street, or highway, is a nuisance."

*Glenn* (1958) 49 Cal.2d 815, 818 [323 P.2d 85], we repeated the pre-*Muskopf* "general rule" that "in the absence of a statutory or constitutional provision to the contrary, the state and its agencies are immune from liability for tort in the discharge of governmental duties and activities." The plaintiff asserted alternative statutory bases of liability in sections 22725-22732 of the Water Code and section 3479 of the Civil Code. We concluded that except in particular circumstances the Water Code provisions were not designed to abrogate the rule of immunity, but with respect to section 3479 we held that the *facts* of the case did not constitute a nuisance within the meaning of the code. As the dissent aptly demonstrates, we recognized that under proper factual conditions, section 3479 would provide a statutory basis for governmental liability. (49 Cal.2d at pp. 821-822.)

Additional support for the contention that section 3479 provides sufficient statutory foundation for nuisance actions against public entities can be found in *Mulloy* v. *Sharp Park Sanitary Dist.* (1958) 164 Cal.App.2d 438 [330 P.2d 441]. There the court affirmed a jury verdict for the plaintiffs after the defendant district had flooded plaintiffs' home. After discussing the issue of governmental immunity and the relevancy of section 3479, the Court of Appeal concluded: "It cannot be questioned that the facts proved do constitute a nuisance within the above statutory definition." (*Id.* at p. 441; cf. *Mercado* v. *City of Pasadena* (1959) 176 Cal.App.2d 28, 34-35 [1 Cal.Rptr. 134], disapproved on other grounds *Teall* v. *City of Cudahy* (1963) 60 Cal.2d 431, 434 [34 Cal.Rptr. 869, 386 P.2d 493]; *Zeppi* v. *State of California* (1959) 174 Cal.App.2d 484, 486-487 [345 P.2d 33].)

It therefore appears that with respect to nuisance the rule immediately prior to the enactment of the Tort Claims Act was consistent with that subsequently required by the act: to avoid the general rule of immunity, a suit for nuisance must find statutory support and such support may be furnished by section 3479. (See A Study Relating to Sovereign Immunity, 5 Cal. Law Revision Com. Rep. (Jan. 1963) pp. 1, 227.) "The fact that [the nuisance statutes] are general in language, and do not specifically refer to public entities, does not preclude their application to such entities, because generally worded code sections are applied to governmental bodies if no impairment of sovereign powers would result." (Van Alstyne, *supra,* § 5.10 at p. 126; see also *Flournoy* v. *State of California* (1962) 57 Cal.2d 497, 498-499 [20 Cal.Rptr. 627, 370 P.2d 331].)

While neither party in the instant case has cited controlling authority holding that nuisance actions against public bodies are either precluded or permitted by operation of Government Code section 815, three opinions of

the Court of Appeal have impliedly recognized the continued existence of such a cause of action.

In *Burrows* v. *State of California* (1968) 260 Cal.App.2d 29 [66 Cal. Rptr. 868] (hg. den.), the court was called upon to interpret an agreement particularly damaging to plaintiffs. There the court concluded that a clause stipulating the state's act was "not a nuisance" was "nothing but an erroneous legal conclusion which the trial court should not have accepted." (*Id.* at p. 34.) In *Granone* v. *County of Los Angeles* (1965) 231 Cal.App.2d 629 [42 Cal.Rptr. 34], the flooding of plaintiff's land resulted in crop destruction. The court affirmed recovery predicated on four grounds, including nuisance pursuant to Civil Code section 3479 but, as in *Burrows*, made no mention of the relevance of section 815. While the trial in *Granone* occurred prior to the effective date of the Tort Claims Act, the act is specifically made retroactive (Stats. 1963, ch. 1681, § 45, at pp. 3288-3289) and accordingly the Court of Appeal in reviewing *Granone* in 1965 was bound to consider the mandate, if any, of section 815 as well as other provisions of the act. (See *Carpenter* v. *Wabash Ry. Co.* (1940) 309 U.S. 23, 27 [84 L.Ed. 558, 561-562, 60 S.Ct. 416]; *Linkletter* v. *Walker* (1965) 381 U.S. 618, 626-627 [14 L.Ed.2d 601, 606-607, 85 S.Ct. 1731].)[9] Nevertheless, the court upheld a recovery based in part on a nuisance theory.

Finally, in *Lombardy* v. *Peter Kiewit Sons' Co.* (1968) 266 Cal.App.2d 599, 605-606 [72 Cal.Rptr. 240], the court concluded that the plaintiffs had not stated a cause of action for nuisance against the state because the acts complained of were specifically authorized by statute. The court, in ruling directly on the merits of the plaintiffs' contentions rather than deciding nuisance was unavailable by operation of section 815, impliedly recognized that a cause of action for nuisance still remains. (Cf. *City of Burbank* v. *Superior Court* (1965) 231 Cal.App.2d 675 [42 Cal.Rptr. 23] [holding that a cause of action against a public entity for nuisance must be separately stated but remanding to the trial court apparently to allow the trial judge to rule on, among other things, the availability of nuisance in light of section 815].)

Additional support for the conclusion that section 3479 of the Civil Code provides the statutory basis for nuisance actions as required by section 815 may be traced to more recent recommendations of the Law Revision Commission. It should be remembered that it was the commis-

---

[9]As Professor Van Alstyne has stated with respect to the retroactive nature of the Tort Claims Act: "[T]he rule of full retroactivity . . . has a variety of effects, including . . . abrogation of previously accrued causes of action based on the *Muskopf* doctrine, both for injuries that accrued before the 1961 moratorium statute (effective September 15, 1961) and for those that accrued after that date . . . ." (Van Alstyne, *supra*, § 11.2, at pp. 462-463; cf. *Teall* v. *City of Cudahy, supra*, 60 Cal.2d 431, 432 [34 Cal.Rptr. 869, 386 P.2d 493]; *Thelander* v. *Superior Court* (1962) 58 Cal.2d 811, 814 [26 Cal.Rptr. 643, 376 P.2d 571].)

sion's study on governmental immunity (A Study Relating to Sovereign Immunity, *supra,* 5 Cal. Law Revision Com. Rep. (Jan. 1963) p. 1) which spawned the Tort Claims Act of 1963. One year after the enactment, Professor Van Alstyne, the author of the commission's report, concluded that, notwithstanding the statement in the Senate comments that nuisance actions could be maintained pursuant to "some other statute that may be applicable to the situation" (Legislative Committee Comments—Sen., Gov. Code, § 815), section 815 "was intended to eliminate any public entity liability for damages on the ground of common law nuisance." (Van Alstyne, *supra,* § 5.10, at p. 126.)

Accordingly, in 1969 the commission proposed a series of amendments to the Tort Claims Act (Recommendation Relating to Sovereign Immunity, 9 Cal. Law Revision Com. Rep. (Sept. 1969) p. 803); to clarify what it conceded to be the existing uncertainty with respect to nuisance actions against public entities, the first recommendation was to specifically eliminate such liability.[10]

On January 12, 1970, Senator Song introduced Senate Bill No. 94 which contained, without a single alteration, the entire series of commission recommendations on several aspects of governmental tort liability, including the commission's suggestion that public entities be immune from suits founded on Civil Code section 3479. However, when Senate Bill No. 94 was reported out of the Assembly on August 9, 1970, the nuisance immunity provision was deleted from the bill and it was in such excised form that the bill became law. (Stats. 1970, ch. 1099, p. 1957.)

In view of the pervasive influence the commission has enjoyed in the field of governmental immunity, practically authoring both the 1963 act[11] and the 1970 amendments,[12] we must conclude that the Legislature, with

[10]The commission's textual recommendation was as follows: "To eliminate the existing uncertainty and to effectuate the Legislature's original intention, the Commission recommends that a new section—Section 815.8—be added to the Government Code expressly to eliminate liability for damages for nuisance under Part 3 (commencing with Section 3479) of Division 4 of the Civil Code. This section would eliminate liability for damages based on a theory of common law nuisance." (9 Cal. Law Revision Com. Rep. at p. 810.) The commission's proposed legislation on the subject read: "Section 815.8 is added to the Government Code, to read: 815.8 A public entity is not liable for damages under Part 3 (commencing with Section 3479) of Division 4 of the Civil Code." (*Id.* at p. 837.)

[11]See letter to the Governor from Commission Chairman Sato (Recommendation Relating to Sovereign Immunity, *supra,* 9 Cal. Law Revision Com. Rep. (Sept. 1969) p. 803; Van Alstyne, *supra,* § 5.3, at p. 120; compare Legislative Committee Comments—Senate, Gov. Code, § 815, with Recommendation Relating to Sovereign Immunity, *supra,* 4 Cal. Law Revision Com. Rep. (Jan. 1963) pp. 803, 837-838).

[12]Compare Statutes 1970, chapter 1099, with Recommendation Relating to Sovereign Immunity, *supra,* 9 Cal. Law Revision Com. Rep. (Sept. 1969) pp. 803, 837.

due deliberation, decided to reject the commission's proposal to bar suits against public entities for nuisance. ■ Consequently it is manifest that the Legislature intended to allow such causes of action if they could be tailored to meet the specifications of statutory provisions, such as section 3479 of the Civil Code.

This conclusion is further supported by the profound interest the 1970 Legislature demonstrated in the eradication of the evils caused by the various forms of pollution, with particular emphasis on noise pollution.[13] Since it is well-documented that a nuisance theory provides an effective means for redress in a wide range of actions resulting from pollution including noise disturbance,[14] it appears that, in deleting the commission's

[13]See generally State of California (1970) Laws Relating to the Protection of Environmental Quality. The Legislature has specifically recognized the rising problem of airport noise and its effects on the quality of the environment: "The Legislature finds that . . . (b) The proliferation of noise from transportation sources have [sic] led to the exposure of large sectors of the populace to an unacceptable degree of noise. (c) The anticipated rates of construction of new airports and extension of existing airports, construction of freeways and mass rapid transit lines, and the introduction into service of intraurban short takeoff and land and vertical takeoff and land aircraft operating at low cruising altitudes will rapidly escalate the urban noise problem unless systematic preventive measures are taken." (Gov. Code, § 16000, Stats. 1968, ch. 1395; Stats. 1969, ch. 1042; see also Gov. Code, § 16001, Stats. 1968, ch. 1395.) The foregoing statute was repealed in 1970 when related sections were added to the Public Utilities Code (Stats. 1970, ch. 346).

As part of its program to combat airport noise pollution, the Legislature passed several amendments to the Public Utilities Code (Stats. 1969, chs. 712, 1585; Stats. 1970, chs. 912, 1293). Section 21669 of that code states: "The department [Department of Aeronautics] shall adopt noise standards governing the operation of aircraft and aircraft engines for airports operating under a valid permit issued by the department to an extent not prohibited by federal law. The standards shall be based upon the level of noise acceptable to a reasonable person residing in the vicinity of the airport." Section 21669.4 provides, in part: "The violation of the noise standards by any aircraft shall be deemed a misdemeanor and the operator thereof shall be punished by a fine of one thousand dollars ($1,000) for each infraction." (See also Pub. Util. Code, §§ 21666, 21669.2, 21669.3.)

For recent enactments on the subject of noise generally, see Public Resources Code section 21001, subd. (b); Streets and Highways Code sections 75.7, 216; Vehicle Code sections 23130, 27001, 27150, 27151, 27160; and Harbors and Navigation Code sections 654, 668.

Two code provisions deal with abatement of airports as nuisances and condemnation of airspace by nuisance. (Code Civ. Proc., §§ 731b, 1239.3.) Neither, however, provides for a monetary recovery for damages.

[14]Causes of action for nuisance are often included in pollution suits. (See, e.g., *Reynolds Metals Co.* v. *Martin* (9th Cir. 1964) 337 F.2d 780.) In general, nuisance provides a proper ground for recovery for noise disturbance. (See Kramon, *Noise Control: Traditional Remedies and a Proposal for Federal Action* (1969) *supra,* 7 Harv. J. Legis. 533, 538-544; see also Malley, *The Supersonic Transport's Sonic Boom Costs: A Common Law Approach* (1969) *supra,* 37 Geo.Wash.L.Rev. 683; Alekshun, *Aircraft Noise Law: A Technical Perspective* (1969) 55 A.B.A.J. 740; Note, *Jet Noise in Airport Areas: A National Solution Required* (1967) 51 Minn. L.Rev. 1087.)

recommendation to preclude governmental nuisance liability, the Legislature intended to preserve this additional weapon in the arsenal available to combat grievous injury to the environment. We therefore conclude that section 815 of the Government Code does not bar nuisance actions against public entities to the extent such actions are founded on section 3479 of the Civil Code or other statutory provision that may be applicable. Accordingly we hold that the trial court incorrectly dismissed plaintiffs' cause of action for nuisance on the ground that it was precluded by section 815 of the Government Code.

■ Since the court also ruled that plaintiffs had failed to state *facts* sufficient to state a cause of action for nuisance, plaintiffs should be allowed to amend this count to allege personal injuries suffered as a result of the purported nuisance. (See *Kornoff* v. *Kingsburg Cotton Oil Co.* (1955) 45 Cal.2d 265, 272 [288 P.2d 507]; *Herzog* v. *Grosso* (1953) 41 Cal.2d 219, 225-226 [259 P.2d 429]; see Prosser, Torts (4th ed. 1971) at p. 603; cf. *Vater* v. *County of Glenn* (1958) *supra,* 49 Cal.2d 815, *Mercado* v. *City of Pasadena* (1959) *supra,* 176 Cal.App.2d 28, disapproved on other grounds *Teall* v. *City of Cudahy* (1963) 60 Cal.2d 431, 434 [34 Cal.Rptr. 869, 386 P.2d 493]; *Zeppi* v. *State of California* (1959) *supra,* 174 Cal. App.2d 484.)[15] The court made no findings, although requested by appellants to do so, as to whether appellants suffered such damages.

On remand, concern over application of the proper statute of limitations may arise. ■ If appellants demonstrate that whatever nuisance caused by defendant is continuing in nature, every repetition of the wrong may create further liability. Hence the statute of limitations would not run merely from the original intrusion. This is the well-settled rule with respect to property damage (see, e.g., *Phillips* v. *City of Pasadena* (1945) *supra,* 27 Cal.2d 104, 107-108), and it would be incongruous for each repetition to be considered a separate wrong for property damage purposes but not for personal injuries. To the extent *Strzelczyk* v. *Marki* (1959) 169 Cal. App.2d 703 [337 P.2d 846], adopts a contrary position, it is disapproved. Accordingly, if the statute of limitations becomes an issue, the trial court must determine whether nuisance causing personal injury loss has con-

---

[15]We do not reach the question of whether appellants are entitled to show property damage caused by conduct of defendant which purportedly constitutes a nuisance or by defendant's alleged negligence or zoning violations (see discussion, *infra*). Of course, to the extent any claim for property damages under counts II, III and IV is identical to those damages which were sought in the inverse condemnation action, such claim would be barred by the trial court's finding of no property damage under that count.

cluded or is continuing and then apply the appropriate statute of limitations principles.[16]

*Negligence and Zoning Violations*

Plaintiffs' third cause of action alleges that defendant was negligent in permitting the airport to be used for takeoff and landing by jet aircraft. Their fourth cause of action alleges that a portion of the Santa Monica airport is located within an area of the City of Los Angeles zoned for single-family residential use and thus is in violation of *Los Angeles* zoning ordinances. The trial court ruled on the viability of these causes of action immediately prior to trial and held them legally insufficient. Plaintiffs offered to amend counts III and IV under theories encompassed by Government Code sections 815.2, 815.6, 830, 835 and Civil Code section 3479. The court denied leave to amend.

Without determining the propriety of the court's ruling on the insufficiency of counts III and IV, or the applicability of the suggested code sections to those causes of action, we conclude the trial court improperly denied plaintiffs an opportunity to amend. (*Scott* v. *City of Indian Wells* (1972) 6 Cal.3d 541, 549-550 [99 Cal.Rptr. 745, 492 P.2d 1137].) We appreciate that the trial court's dilemma was exacerbated when the case at bench was scheduled for trial without a complete disposition of pretrial matters. The pretrial order preserved as an issue the legal sufficiency of the complaint. In so doing, the order in effect continued a fundamental part of the pretrial proceedings for determination at or immediately prior to trial.[17] Accordingly, we are not presented with circumstances in which a

---

[16]The trial court concluded that as a matter of law the airport was not a nuisance because it was maintained under the authority of several statutes. Section 3482 of the Civil Code provides: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance."

In *Hassell* v. *San Francisco* (1938) 11 Cal.2d 168 [78 P.2d 1021], appellant contended that, by virtue of section 3482, the construction of a public convenience station above ground could not constitute a nuisance. In rejecting that argument, we interpreted the section narrowly, stating (at p. 171): " 'A statutory sanction cannot be pleaded in justification of acts which by the general rules of law constitute a nuisance, unless the acts complained of are authorized by the express terms of the statute under which the justification is made, or by the plainest and most necessary implication from the powers expressly conferred, so that it can be fairly stated that the legislature contemplated the doing of the very act which occasions the injury.' " It would appear that section 50470 of the Government Code and sections 21002, 21662 and 21667 of the Public Utilities Code, relied upon by the trial judge, are too general in nature to constitute the authority envisioned by section 3482 under the interpretation in *Hassell*. In any event, this issue was neither pleaded nor argued at trial.

[17]As noted previously, the sufficiency of the cause of action for nuisance was not ruled upon until after the conclusion of trial, thus extending essentially pretrial matters until judgment.

late amendment is proffered and the court concludes there has been inexcusable delay. (See *Bank of America etc. Assn.* v. *Goldstein* (1938) 25 Cal.App.2d 37, 46-47 [76 P.2d 545]; 3 Witkin, Cal. Procedure (2d ed. 1971) § 1048 at pp. 2623-2625.) Instead, because of the unusual nature of these proceedings, the general rule of liberal construction of pleadings (Code Civ. Proc., § 452) and of liberal allowance of amendments *(Scott* v. *City of Indian Wells, supra; Simons* v. *County of Kern* (1965) 234 Cal.App.2d 362, 367-368 [44 Cal.Rptr. 338]) should prevail. Furthermore, plaintiffs did describe the purported legal foundation for their proposed amendments notwithstanding the fact that section 472c of the Code of Civil Procedure does not require a specific request to amend, or an indication of its legal basis, as a prerequisite to reviewing the trial court's order on appeal. (*Scott* v. *City of Indian Wells, supra,* 6 Cal.3d 541, 550.)

With these general considerations in mind, we now turn to the individual issues presented in counts III and IV. The Government Code sections to which plaintiffs referred in their request for leave to amend have strains of negligence running throughout, thus indicating plaintiffs may be able to state a cause of action for negligence based on some of those provisions. It is true that the trial court partially based its reason for denying plaintiffs leave to amend on the ground that count III (as well as count IV) was preserved by the nuisance cause of action. ■■■ However, facts supporting theories of dangerous and defective conditions of property (Gov. Code, § 830 et seq.), statutory liability (Gov. Code, § 815.6) and vicarious liability (Gov. Code, § 815.2) must be stated separately from a cause of action for nuisance. (*City of Burbank* v. *Superior Court* (1965) 231 Cal.App.2d 675, 684 [42 Cal.Rptr. 23].)[18]

With respect to Santa Monica's purported violation of the zoning ordinances of the City of Los Angeles, it is unclear whether plaintiffs propose to amend their complaint pursuant to the Government and Civil Code sections referred to previously or whether some other theory will be advanced. In either event, the liberal rules of pleadings and amendments reviewed above apply equally to count IV. ■■■ In general the concept is long-standing that a private person who suffers identifiable harm by reason of a violation of a municipal zoning law may sue the violator for

---

[18]Defendant contends that since the court found that the airport was not a dangerous or defective condition of property, plaintiffs cannot amend asserting such theory. However, in dismissing counts II, III, and IV, the court necessarily decided only the inverse condemnation action on the merits, in connection with which the issue of dangerous or defective condition of property is immaterial. Therefore, the finding that the airport is not a dangerous or defective condition of property is likewise immaterial.

compensatory damages and may also seek injunctive relief when applicable. (*Sapiro* v. *Frisbie* (1928) 93 Cal.App. 299, 313 [270 P. 280]; see also *McIvor* v. *Mercer-Fraser Co.* (1946) 76 Cal.App.2d 247, 250, 253-254 [172 P.2d 758].) ■ While in the vast majority of zoning cases a private party is the defendant, there appears no valid reason why, under the proper circumstances, an action against a municipal body for violating the zoning ordinances of a neighboring municipality cannot be maintained.[19] To the extent this action for zoning violations may raise novel questions not presented in similar suits against private parties, they may be considered below on remand.

Having concluded that plaintiffs are entitled to amend counts III and IV, we again realize the question of the proper statute of limitations may arise in further proceedings. Until plaintiffs plead facts indicating how liability under those counts is alleged to have accrued, however, we cannot ascertain whether the one-year statute of limitations of Code of Civil Procedure section 340 necessarily bars plaintiffs' ability to recover for personal injuries caused by defendant's negligence or zoning violations. If the conduct of defendant giving rise to liability is continuing in nature every repetition of the wrong may be actionable. Such a rule has a long history in nuisance actions (see, e.g., *Phillips* v. *City of Pasadena, supra,* 27 Cal.2d 104, 107-108) and by analogy may apply to certain factual situations causing personal injury as well as property damage for negligence and zoning violations. Only after sufficient facts are pleaded will the applicability of the statute of limitations be ascertainable.[20]

*Conclusion*

For the foregoing reasons, the judgment for defendant on the cause of action for inverse condemnation is affirmed; the judgment dismissing the counts for nuisance, negligence and zoning violations is reversed and the cause is remanded to the trial court for proceedings consistent with this opinion.

Wright, C. J., Peters, J., Tobriner, J., and Kaus, J.,* concurred.

---

[19]We are not presented here with the more difficult question of the liability of a city for violating its *own* zoning laws.

[20]Defendant argues that appellants could not state a cause of action for counts III and IV because the trial court found no property damage and that personal injury recovery would be barred by section 340 of the Code of Civil Procedure. As we have stated the effect of the statute of limitations on counts III and IV can only be determined after appellants are allowed to amend. Appellants made several requests for findings with respect to personal injury damages but the trial court denied such requests.

*Assigned by the Chairman of the Judicial Council.

**BURKE, J.**—I concur with the majority herein to the extent they affirm judgment for defendant on the inverse condemnation cause of action, and reverse and remand the cause with respect to the negligence and zoning violation counts. I dissent, however, from the reversal of the judgment dismissing the *nuisance* count for in my view the California Tort Claims Act quite clearly immunizes governmental agencies from liability for nuisance, except insofar as such nuisance may be actionable under specific provisions of the act itself.

As indicated by the majority, the "cornerstone" of the legislative approach under the act is set forth in Government Code section 815, which provides: *"Except as otherwise provided by statute:* (a) A public entity is not liable for an injury, whether such injury arises out of an act or omission of the public entity or a public employee or any other person." (Italics added.) The California Law Revision Commission, which drafted and proposed adoption of the various sections of the act, recommended to the Legislature that it adopt the "basic statutory approach" that a public entity "should be liable only as made liable by specific enactment," rather than being "made liable for all damages and injuries caused by their activities except as such liability is limited or conditioned by statute." (Recommendation Relating to Sovereign Immunity, 4 Cal. Law Revision Com. Rep. (Jan. 1963) p. 811.) The commission reasoned that a grant of immunity subject to specific exceptions "will provide a better basis upon which the financial burden of liability may be calculated, since each enactment imposing liability can be evaluated in terms of the potential cost of such liability." (*Id.*)

Accordingly, the commission recommended adoption of language substantially identical to section 815, quoted above. In its comment following proposed section 815, the commission noted that "In the following portions of this division, there are many sections providing for the liability of governmental entities under specified conditions. In other codes there are a few provisions providing for the liability of governmental entities, *e.g.,* Vehicle Code Section 17001 et seq. [*expressly* declaring that a public entity is liable for death or injury caused by negligent operation of a motor vehicle by an employee] and Penal Code Section 4900 [*expressly* authorizing claims against the State for pecuniary injuries suffered by persons erroneously convicted and imprisoned]. But there is no liability in the absence of an enactment declaring such liability. For example, there is no section in this statute declaring that public entities are liable for nuisance, even though the California courts have previously held that public entities are subject to such liability even in the absence of statute. *Under this statute, the right to recover damages for nuisance will have to be established*

*under the provisions [of the Tort Claims Act] relating to dangerous conditions of public property or under some other statute that may be applicable to the situation." (Id.* at p. 837, italics added; see also West's Annot. Cal. Codes, Gov. Code, § 815, and comment.)

The majority, by emphasizing the words "some other statute" in the preceding sentence, would have us believe that the commission intended to leave open the possibility of imposing liability upon governmental entities under the general nuisance provisions of Civil Code section 3479. The majority note that several prior California cases had imposed such liability even though section 3479 is silent in its application to governmental entities. And yet it is precisely this line of cases which, according to the commission, "previously held that public entities are subject to such [nuisance] liability even in the absence of statute," and which the commission sought to circumvent by the adoption of section 815.

As noted above, the commission suggested that liability for nuisance would have to be established under the provisions of the act relating to dangerous conditions of public property, i.e., Government Code section 830 et seq. The commission's comment regarding proposed section 830 conclusively establishes its intent that a government entity would be immune from liability for nuisance under Civil Code section 3479: "Under the previous law, public entities were liable for maintaining a nuisance; but under this statute liability for conditions that would constitute a nuisance will have to be based on the somewhat more rigorous standards set forth in this chapter. *Liability for such conditions cannot be imposed upon a nuisance theory because Section 815 provides public entities with immunity from liability unless liability is imposed by an enactment, and there is no enactment imposing liability on a nuisance theory."* (Recommendation Relating to Sovereign Immunity, *supra,* 4 Cal. Law Revision Com. Rep., p. 848, italics added; see also West's Annot. Cal. Codes, *supra,* Gov. Code, § 830, and following comment.) The foregoing reports are entitled to "substantial weight" in construing section 815. (See *Keeler* v. *Superior Court,* 2 Cal.3d 619, 630 [87 Cal.Rptr. 481, 470 P.2d 617, 40 A.L.R.3d 420].)

The majority wholly ignore the foregoing statement of the commission's intent. They also ignore the evident fact that if governmental entities remain liable upon a general nuisance theory, the provisions of Government Code section 830 et seq. (pertaining to liability for dangerous conditions) are rendered largely superfluous. It is a cardinal principle of statutory interpretation that "The courts will not presume that the legislature in enacting a statute indulged in an idle act. The presumption is that it intended the statute to have some effect." (45 Cal.Jur.2d, Statutes, § 99, p. 613.)

And yet under the majority's holding, the restrictions upon the imposition of liability set forth in sections 830 through 835.4 of the Government Code may be easily circumvented by characterizing the alleged negligent act as a "nuisance" and bringing suit under Civil Code section 3479. As stated by Professor Van Alstyne, "many tort situations involving ordinary negligence, for which governmental immunity would otherwise be a complete defense, may reasonably be construed as within the concept of nuisance." (A Study Relating to Sovereign Immunity, 5 Cal. Law Revision Com. Rep. (Jan. 1963) p. 229; see *Van Zyl* v. *Spiegelberg*, 2 Cal.App.3d 367, 372-373 [82 Cal.Rptr. 689] [negligence and nuisance are not two separate torts; nuisance is "a species of damage" resulting from ordinary tortious conduct]. The facts alleged in the instant case provide a good example of a type of tort situation which could be forced into either a negligence or nuisance mold, at the option of the plaintiff.

The majority quote Professor Van Alstyne to support their view that "a suit for nuisance must find statutory support and such support may be furnished by section 3479." (*Ante*, p. 933.) Yet the majority fail to complete Van Alstyne's remarks. Immediately following the portion quoted by the majority, he states: "However, *in light of the legislative intent to preclude nuisance liability unless provided by a statute such as the specific dangerous condition statute,* the *sounder* view, it is submitted, would *deny* application of the Civil Code's general provisions and require public entities' nuisance liability to rest on statutory language *expressly applicable to public entities.* See . . . Law Revision Commission Comment, § 830 [quoted above]." (Italics added; Van Alstyne, Cal. Government Tort Liability (Cont. Ed. Bar 1964) § 5.10, pp. 126-127.)

The majority cite certain cases decided following the enactment of the Tort Claims Act which "impliedly recognized" the continued existence of a nuisance action. None of these cases, however, expressly considered the question in the light of the clear legislative history set forth above. As Van Alstyne recognizes, citing two of the three cases relied upon by the majority, "no opinion has been found which undertakes a careful analysis of this branch of the law." (Van Alstyne, Cal. Government Tort Liability Supplement (Cont. Ed. Bar 1969) § 5.10, p. 3.)

Finally, the majority make the disparate argument that the Legislature, by "rejecting" in 1970 proposed legislation which would have expressly immunized government entities from nuisance liability, therefore must have "decided to reject the commission's proposal to bar [such] suits . . . . Consequently, it is manifest that the Legislature intended to allow such causes of action if they could be tailored to meet the specifications of statutory provisions, such as section 3479 of the Civil Code." (*Ante,*

p. 936.) Is it not just as likely that the Legislature rejected the 1970 proposal as wholly unnecessary in view of the clear legislative history reviewed above? (Or that the new proposal simply died in committee without ever reaching the main bodies of the Legislature?) That there exists a wide range of possible reasons why proposed legislation is not adopted strongly suggests to me that the mere fact of rejection affords a useless tool for exploring positive legislative intent.

The nuisance immunity provision in Senate Bill No. 94 was not the only provision ultimately to be deleted from the bill. In addition, the Legislature or legislative committee rejected a commission proposal to eliminate design immunity under certain specified situations. (See 9 Cal. Law Revision Com. Rep. (1969) p. 816.) Yet that rejection did not influence our subsequent analysis concerning the probable legislative intent underlying the design immunity provision of the act, section 830.6. (See *Baldwin v. State of California*, 6 Cal.3d 424, 435 [99 Cal.Rptr. 145, 491 P.2d 1121].) If we drew no inferences in *Baldwin* from the fact that the Legislature had failed to adopt the proposed legislation, how are we justified in doing so in this case?

As indicated above, the rationale underlying the commission's proposal to grant immunity subject to specific exceptions was to provide government entities with some basis for evaluating the potential costs of liability. The majority's approach, namely, to sanction the imposition of liability under general statutory provisions not expressly applicable to government entities, totally undermines that rationale and precludes even a rough estimation of potential liability.

In view of the language of section 815, the express legislative intent underlying the adoption of sections 815 and 830, and the policy underlying the Tort Claims Act itself, I find it inescapable that the Legislature intended to immunize governmental entities from liability for nuisance under Civil Code section 3479. Accordingly, the trial court properly entered judgment in favor of defendant on plaintiff's nuisance cause of action.

McComb, J., concurred.

Respondent's petition for a rehearing was denied June 7, 1972. Sullivan, J., did not participate therein. Burke, J., was of the opinion that the petition should be granted.