[Civ. No. 66381. Second Dist., Div. One. Aug. 1, 1984.]

VIRGIL U. TILLERY, Individually and as Administrator, etc.,
Plaintiff and Appellant, v.
KENNETH J. RICHLAND, Defendant and Respondent.

**COUNSEL**

Arthur B. Kalnit for Plaintiff and Appellant.

Omansky & Lazarus, Alfred W. Omansky, Horvitz & Levy, Ellis J. Horvitz, Greines, Martin, Stein & Richland, and Kent L. Richland for Defendant and Respondent.

## OPINION

**CARSTAIRS, J.**\*—Appellant in this action sought compensatory and punitive damages against two physicians on a number of intentional tort theories alleging inter alia that their medical treatment of appellant's deceased wife resulted in her personal injury and wrongful death, and alleging fraud, and wilful infliction of emotional distress, upon him and her.

■ This is an appeal from a judgment entered after a jury verdict in favor of defendant, respondent Richland. Appellant purports to appeal from the order denying his motion for a new trial. Such an order is nonappealable. (Code Civ. Proc., § 904.1.) However we will deem it to constitute an appeal from the judgment. (*La Count* v. *Hensel Phelps Constr. Co.* (1978) 79 Cal.App.3d 754 [145 Cal.Rptr. 244].)

The jury rendered a verdict in favor of plaintiff against Dr. Rothman, the codefendant, in the amount of $51,000, in compensatory damages only. The judgment was satisfied and Dr. Rothman is not a party to this appeal.

Appellant urges as a principal ground of appeal that statements attributed to certain jurors improperly influenced the verdict in violation of section 1150 of the Evidence Code, and that certain jurors concealed bias during the voir dire.

He also advances errors in law on the part of the trial judge and urges that the verdict is "contrary to the weight of the evidence" as a third ground.

### THE STANDARD OF APPEAL

As to his third ground, appellant sets forth an incorrect standard, and argues the credibility of defendant's witnesses at length.

■ It is well settled that appellate review of the sufficiency of evidence is governed by the substantial evidence rule. (*Merrill* v. *Department of Motor Vehicles* (1969) 71 Cal.2d 907 [80 Cal.Rptr. 89, 458 P.2d 33]; *Bixby*

*Assigned by the Chairperson of the Judicial Council.

v. *Pierno* (1971) 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242].) ■
"[T]he power of an appellate court *begins* and *ends* with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 784 [59 Cal.Rptr. 141, 427 P.2d 805]; italics in original.)

■ "Moreover, 'in examining the sufficiency of the evidence to support a questioned finding an appellate court must accept as true all evidence tending to establish the correctness of the finding as made, taking into account, as well, all inferences which might reasonably have been thought by the trial court to lead to the same conclusion.'" (*Board of Education* v. *Jack M.* (1977) 19 Cal.3d 691, 697 [139 Cal.Rptr. 700, 566 P.2d 602]; *Bancroft-Whitney Co.* v. *McHugh* (1913) 166 Cal. 140, 142 [134 P. 1157].)

■ Factual matters will be viewed most favorably to the prevailing party (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920 [101 Cal.Rptr. 568]) and conflicts in the evidence will be decided in favor of the respondent. (*Cecka* v. *Beckman & Co.* (1972) 28 Cal.App.3d 5 [104 Cal.Rptr. 374].)

■ Twelve causes of action were alleged all framed as intentional torts arising from the medical care and treatment given Mrs. Tillery. Appellant asked for compensatory damages according to proof and punitive damages on each cause of action of $10 million making a total of $120 million. At the trial in his final argument he modified his demand to $800,000 compensatory and $300,000 punitive damages.

Appellant during the trial was relying not on a theory of negligence but on one of intentional infliction of emotional distress and wilful failure to provide medical assistance resulting in wrongful death. His theory was that Dr. Richland as well as Dr. Rothman withheld knowledge of the cancerous condition of the patient and Dr. Richland particularly withheld knowledge of the cancer so that he could go forward with an unnecessary laminectomy and be paid. His objective was money. The linchpin of this theory is the claim of the plaintiff that Richland told the husband that Mrs. Tillery's lungs were clear.

Dr. Rothman's counsel all but admitted that Dr. Rothman had allowed himself to be intimidated by the plaintiff into the mistake of not telling him of his wife's cancer before March 7. He told him that there was a suspicion of cancer in the chest but he did not tell him that they had ascertained that there was in all likelihood a serious carcinoma condition. The jury returned a verdict of $51,000, in compensatory damages only, against Dr. Rothman, but found against the plaintiff and in favor Dr. Richland.

Cognizant of our obligation, we have reviewed the entire record to determine whether there existed substantial evidence justifying this outcome in respect to Dr. Richland.

## THE SUBSTANTIAL EVIDENCE IN SUPPORT OF THE VERDICT

Complaining of back pain Mrs. Tillery, age 67, came to the office of Dr. George Rothman. He examined her and found tenderness in the lower portion of her back and prescribed medication and referred her for X-rays. On February 17, Dr. Rothman received a telephone call from plaintiff who was very angry. He said the medication appeared to be making his wife sick and her back was worse. He was advised to have her discontinue the medication for pain and have X-rays taken immediately. The X-rays were taken and she was hospitalized at Tarzana Medical Center where Dr. Rothman was a member of the staff. He learned that the X-rays of the back showed a spondylolisthesis, which is a slippage forward of one vertebra on top of another. He concluded that this could be the cause of the pain, and recommended conservative treatment, that is, bed rest, traction, hot packs and massage. He also ordered chest X-rays as a part of the routine physical examination. When her back pain continued to worsen he called Dr. Richland on February 20.

Dr. Richland has been a neurological surgeon for over 30 years and was on the staff of four hospitals. He is a board certified member of the American Board of Neurological Surgeons, was a member of faculty of several medical schools, and at the time of his attendance on Mrs. Tillery was associate clinical professor of surgery at U.C.L.A., teaching neurological surgery. He is a member of a number of neurological surgeons' societies and a fellow of the American College of Surgeons and of the International College of Surgeons.

Dr. Rothman asked Dr. Richland to examine Mrs. Tillery with regard to possible surgery. Although informed by Dr. Rothman that there appeared to be no insurance, Dr. Richland nevertheless said he would see her as soon as he could and did so on February 21. Dr. Richland found evidence of compression of nerve roots and recommended bed rest and traction for about a week before deciding on surgery. Meanwhile, Dr. Rothman did receive and read the radiologist report on the chest X-rays which indicated that she might have a cancerous tumor in her chest. Dr. Richland was informed by Dr. Rothman of the possible chest tumor. When the patient's pain continued to get worse Dr. Richland ordered a myelogram on March 3. When Dr. Richland reviewed the myelogram he concluded that the patient was suffering from a slippage of the fourth lumbar vertebra onto the fifth. In addition

he found a defect of one of the vertebrae which was consistent with metastasis of the lung cancer to the spinal region.

Once Mrs. Tillery was in the hospital the relationship between Mr. Tillery and Dr. Rothman deteriorated greatly. Early on, Mr. Tillery asked Dr. Rothman what business he had taking chest X-rays when the problem was with her back and asked that the report on the X-rays be given to him. On other occasions he demanded that Dr. Rothman stop urging his wife to stop smoking which she was continuing to do while in the hospital, and shortly thereafter attempted to bar Dr. Rothman from entering his wife's room and demanded that he stop bothering her about smoking and leave her alone. Dr. Rothman testified that he was stunned by Mr. Tillery's belligerent attitude and hence did not tell him about the cancer. As will be later set forth in more detail there was substantial medical testimony to the effect that from the very outset her cancer was inoperable and untreatable.

In view of her continuing severe pain Dr. Richland recommended performance of a laminectomy, which consists of surgical removal of some of the bones lying over the spinal canal and cord, to take pressure off the cord for pain relief and also to see if there was metastasis of the cancer to the lumbar region. He explained the procedure to both of the Tillerys, explained the risks, and explicitly described the possibility of spinal fluid leakage. Mrs. Tillery consented to the surgery. It was scheduled for March 7, at 3 or 3:30 p.m.

On the afternoon of March 7, while both Drs. Rothman and Richland were preparing for surgery in the locker room adjacent to the operating room, Dr. Richland asked Dr. Rothman if he had told the Tillerys that the patient had chest cancer. Rothman answered that he had not done so. Richland was surprised and concerned and said that it was necessary to tell Mr. Tillery immediately. They did so, Dr. Richland doing the talking, because Dr. Rothman had no rapport with Mr. Tillery. Dr. Richland told Mr. Tillery that they needed a consultant for her cancer and Tillery asked Dr. Richland if he could get her through the surgery. Dr. Richland responded he was most certain that he could. Tillery then said he wanted the back problem addressed immediately because that was the one that was giving her the severe pain. He said that he did not want a chest consultant now because his wife "cannot know about the cancer, she couldn't handle it." He asked that they make sure that she not know about this problem in her lung. Dr. Richland knew that an individual could be a poor surgical risk because of a negative mental attitude and relying on Mr. Tillery's knowledge of his wife's emotional condition did not inform her of the cancer condition before the surgery.

The laminectomy was only partially successful because she remained with pain and had difficulty walking. A leakage of spinal fluid was noted resulting from the puncture of the dura which had occurred when the myelogram was performed by another doctor. Expert testimony confirmed that this was not an unusual circumstance and had nothing to do with the operation as performed by Dr. Richland.

Although Mrs. Tillery still should have been maintained in the hospital for optimum advantage, nevertheless at the specific request of both of the Tillerys she was released on March 25, because Mrs. Tillery's sister had come to visit her and apparently was a nurse's aid who could look after her. On the strength of that, Dr. Richland consented to have her taken home as long as she had nursing care, although he said he would prefer that she stay in the hospital. During the nine days that she spent at home Dr. Richland made two house calls at Mr. Tillery's request and did not charge for those house calls. During that period of time he called several times to inquire about her condition. It transpired that she needed injections to help her situation and because the sister was not a registered nurse, Mr. Tillery asked that Mrs. Tillery be admitted to a hospital. She was. Dr. Richland was on the staff of West Hills Hospital and it was to that hospital that she was taken. X-rays, April 10, showed the chest condition to be almost identical to what it had been on February 18, when the X-rays were first taken.

On February 21, Mr. Tillery had reported that Mrs. Tillery had sustained a work-related injury to her back and therefore workers' compensation insurance was available for her expenses connected with that injury.

On April 10 or 11, Dr. Richland brought in some consultants specializing in cancer. A biopsy was recommended by a Dr. Bendon, a thoracic surgeon. Dr. Bendon explained to the patient that the biopsy involved the possibility of cancer which distressed her greatly and she refused to consent to the biopsy. At first Mr. Tillery refused to permit the biopsy because Dr. Bendon would not agree that it was an industrially related injury, to be paid for by the workers' compensation insurance carrier. Later both Tillery and his wife consented to the biopsy. The pathology report confirmed a highly virulent cancer which had been growing at least four to five years before it was first discovered in the February 18 X-ray. Dr. Zeitz, a cancer specialist, was brought in by Dr. Richland. His opinion was that she was in a rapidly advancing malignant state and had no more than six months to live. Neither chemotherapy nor radiation therapy in his opinion would help prolong her life and he concluded that the palliation of her pain was her major problem. He recommended a cordotomy. This is a last ditch surgical procedure performed only when there is a short life expectancy because it is only a temporary palliative. It was performed by Dr. Richland with Dr. Rothman

acting as assistant surgeon. It established reasonable pain control although not of all pain. Thereafter on April 28, she was transferred to Beverly Manor Convalescent Hospital because she did not need further neurosurgical treatment. Dr. Richland was no longer the treating physician but he did visit her two or three times while she was at Beverly Manor Hospital and made no charge for the visits. She died there on June 16, as a result of the effects of the carcinoma of the lung.

In respect to workers' compensation insurance, the evidence showed that Dr. Richland was unconcerned about the payment of his fees, leaving to his office staff any follow-up on billing. His total bill to the Tillerys was $3,300, paid by the compensation carrier. On the other hand there was evidence that Mr. Tillery showed a continuing interest in whether the medical fees were covered by the compensation carrier. He frequently telephoned a Mr. Stockman who represented the compensation carrier, to make certain that all medical expenses would be taken care of by Stockman without complication or delay. When Dr. Bendon would not advise that the biopsy was related to the industrial accident covered by the compensation carrier, Mr. Tillery demanded that Dr. Bendon cancel the surgery because the doctor would not state that the cancer was an industrial injury. Dr. Bendon complied, but Tillery changed his mind later and the surgery was rescheduled. Dr. Bendon submitted a bill to Mr. Tillery because the biopsy was not an industrially related injury. Nevertheless Tillery wrote on the bill that the cancer was caused by the injury and submitted the bill to the carrier even though Dr. Bendon did not authorize such writing. The carrier did pay the bill. Tillery also requested payment for 14 days of nurse's care from the compensation carrier and for the round trip fare of the sister from Oregon, although the evidence showed that the patient was only home for nine or ten days when Mrs. Young was caring for her. He continued to call Stockman frequently while Mrs. Tillery was at West Hills Hospital to make sure that the bills were being paid. " 'In brief the appellate court ordinarily *looks only at the evidence supporting the successful party and disregards the contrary showing.*' " (*Nestle* v. *City of Santa Monica* (1972) 6 Cal.3d 920, 925 [101 Cal.Rptr. 568, 496 P.2d 480]; italics in original.) All conflict, therefore must be resolved in favor of the respondent. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

Cognizant of these rules we now observe that Dr. Richland was not even aware whether the insurance carrier had paid his bills since he was not involved in the billing process. He visited her every day while she was hospitalized. He made house calls while she was home and even visited her at the convalescent hospital when he was no longer her treating physician. The jury could have found that it was perfectly reasonable for Dr. Richland to have relied upon Dr. Rothman, the general practitioner, to have informed

the Tillerys about the chest condition. The general verdict in favor of Dr. Richland implies a finding in his favor of every material fact. (*Codekas* v. *Dyna-Lift Co.* (1975) 48 Cal.App.3d 20, 24 [121 Cal.Rptr. 121].) Appellant's testimony was that Dr. Richland had misrepresented just before the laminectomy that Mrs. Tillery's chest X-rays were clear, and that he was not advised just before the operation that Mrs. Tillery did have cancer. This was obviously not accepted by the jury. Richland made a clinical judgment that it would be inadvisable to postpone the laminectomy in order to inform her about her inoperable cancer. Both doctors testified that they did indeed tell Mr. Tillery about the cancer on March 7, and that he insisted that his wife not be told because she "couldn't handle it." The testimony of Gail Levin, a secretary in the office of Dr. Richland corroborates this circumstance. She testified that Mr. Tillery called Dr. Richland's office and spoke to her on a number of occasions, demanding that his wife not be told about her having cancer.

Dr. Richland produced six expert witnesses who testified for the defense including himself, a diagnostic radiologist, two oncology specialists, one Board certified vascular and chest surgeon and a neurosurgeon. All of these witnesses were well qualified and testified that the February 18 chest X-ray showed an advanced case of lung cancer which was inoperable, untreatable and incurable. They further testified that Dr. Richland fully complied with the standard of care in respect to her untreatable cancer, in respect to her back problems and in respect to his performance of the laminectomy, the postlaminectomy care and the cordotomy. We therefore find that there was substantial evidence to justify the verdict in favor of Dr. Richland.

### THE EVIDENCE OF CHARACTER AND CUSTOM AND HABIT

Appellant next assigns as error the ruling of the trial court in respect to the following testimony: that Dr. Richland had treated a preterminal patient when no other neurosurgeon would touch the case; that on one occasion he was the only surgeon who responded to an emergency call where a man's life was hanging by a thread, and saved that man's life; and that Dr. Richland did not know whether the bills to his patients were paid or not and left the matter to his staff and also never refused to treat a patient because of inability to pay.

As to the first two points of evidence appellant objected on the ground that the evidence was "irrelevant" and "collateral." The court overruled the objection and received the evidence, giving a limiting instruction restricting the consideration by the jury to the issue of damages.

Completely apart from the question of whether appellant made a proper objection which could preserve the issue for trial we hold that this evidence

was not to be excluded by virtue of section 1104 of the Evidence Code.[1] Rather it was a proper exercise of the court's discretion. The evidence is relevant to the issue of the intentional infliction of emotional and physical suffering alleged by the appellant to have been perpetrated for the purpose of earning the money for the operation or operations. In *Allen v. Toledo* (1980) 109 Cal.App.3d 415, 419 [167 P.2d 270], a lawsuit alleging negligent entrustment of a car to a minor, evidence of three prior accidents involving the driver was admitted over Evidence Code sections 1104 and 352 objection for the limited purpose of showing the owner's knowledge of the prior accidents. The jury was told not to consider the evidence in determining the negligence of the actual driver.

This was held to be a valid exercise of the court's discretion. ■ "In reviewing the exercise by the trial court of its discretion under Evidence Code section 352, an appellate court is neither authorized nor warranted to substitute its judgment for that of the trial judge. Relief is available only where the alleged abuse of discretion clearly constitutes a miscarriage of justice." (*Cain v. State Farm Mut. Auto. Ins. Co.* (1975) 47 Cal.App.3d 783, 798 [121 Cal.Rptr. 200].)

■ In respect to the third item of evidence, to wit, the custom of Dr. Richland in respect to the payment of bills and the willingness to treat patients even though they are unable to pay, the objection was made on the ground that it was "inadmissible character evidence." The objection was correctly overruled. This was proper character evidence under section 1105 as to custom and habit. Appellant was attempting to show upon the trial that Dr. Richland was doing unnecessary surgery and withholding information about the cancer only in order to earn medical fees, and that this was malicious and intentional and justified the award of punitive damages. This evidence of his custom and habit served to negate this allegation. It was properly admissible.

### The Issue of Misconduct and Concealed Bias of Certain Jurors

■ The trial judge has wide discretion in ruling on a motion for a new trial. "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." (*Jiminez v. Sears, Roebuck & Co.* (1971) 4 Cal.3d 379, 387 [93 Cal.Rptr. 769, 482 P.2d 681, 52 A.L.R.3d 92].)

---

[1]Evidence Code section 1104: "Except as provided in Sections 1102 and 1103, evidence of a trait of a person's character with respect to care or skill is inadmissible to prove the quality of his conduct on a specified occasion."

Further, it has been held that: "A denial of a motion for new trial grounded on jury misconduct implies a determination by the trial judge that the misconduct did not result in prejudice." (*Andrews* v. *County of Orange* (1982) 130 Cal.App.3d 944, 954 [182 Cal.Rptr. 176].)

Additionally, "[h]owever, in reviewing an order *denying* a motion for a new trial based on jury misconduct, as distinguished from an order *granting* a new trial on that ground, a reviewing court has a constitutional obligation (Cal. Const., art. VI, § 13) to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial. [Citations.]" (*Id.*, at 955.)

We note the circumstances surrounding the verdict of the jury. The jury deliberated three full days and rendered a verdict with a division of nine to three against Dr. Rothman in the amount of $51,000 in compensatory damages only and in favor of Dr. Richland against plaintiff.

Upon the reading of the verdict the jury was polled.

Jurors Hale, Danbom and Bierk answered "no" upon the polling. All the rest of the jurors answered "yes." Affidavits purporting to impeach the jury verdict were offered upon the motion for new trial by appellant, executed by jurors Wasick, Ramirez, Kert, and Aguilar.

Section 657, subdivisions 1 and 2 provides that a new trial may be granted for "1. Irregularity in the proceedings of the . . . jury . . . 2. Misconduct of the jury . . . ." "[M]aterially affecting the substantial rights of such party." (Italics added.)[2]

---

[2]Code of Civil Procedure, section 657, subdivisions 1 and 2: "The verdict may be vacated and any other decision may be modified or vacated, in whole or in part, and a new or further trial granted on all or part of the issues, on the application of the party aggrieved, for any of the following causes, *materially affecting the substantial rights* of such party:

"1. Irregularity in the proceedings of the court, jury or adverse party, or any order of the court or abuse of discretion by which either party was prevented from having a fair trial.

"2. Misconduct of the jury; and whenever any one or more of the jurors have been induced to assent to any general or special verdict, or to a finding on any question submitted to them by the court, by a resort to the determination of chance, such misconduct may be proved by the affidavit of any one of the jurors." (Italics added.)

This section must be read in conjunction with section 1150 of the Evidence Code.[3]

A threshold question is to determine whether the declarations of the jurors do describe juror misconduct or concealed bias.

These declarations describe numerous incidents of alleged juror misconduct and concealed bias.[4] The affidavits of the four jurors Wasick, Ramirez,

---

[3]Evidence Code section 1150, subdivisions (a) and (b):

"(a) Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined.

"(b) Nothing in this code affects the law relating to the competence of a juror to give evidence to impeach or support a verdict."

[4]"DECLARATION OF PETER AGUILAR

"I, PETER AGUILAR, declare that:

"I served on the jury as juror number 12 during the entire trial of the case entitled Tillery v. Rothman and Richland, et al., Los Angeles Superior Court Case No. NWC 48953. During the jury deliberations I expressly heard and witnessed the statements and events that are hereinafter set forth as follows:

"(a) During the deliberations in the jury room, juror number 6, Sammie Danbom, stated that she would not consider awarding Mr. Tillery any money at all because 'why should he get anything when I make less than $6,000.00 a year.'

"(b) During the deliberations in the jury room, juror number 5, Mary Hale, stated that Mr. Tillery was not entitled to any damages because he could not have loved his wife or have been hurt at losing her at all since he was willing to have her cremated.

"(c) During the deliberations in the jury room, the same juror, Mary Hale, also stated that if Mr. Tillery was given any kind of sizable award he would undoubtedly take it and 'blow the money in Las Vegas on a good time.' Juror number 6, Sammie Danbom, expressly signified her agreement with this statement.

"(d) During the deliberations in the jury room, Mrs. Danbom also stated that she was unwilling to find against either defendant especially Dr. Richland because 'the evidence clearly shows that Dr. Richland is a decent and good man who saved other people's lives'.

"(e) On the final day of deliberations the forelady, Virginia Norwood, whom everyone called 'Ginger' stated that she was most reluctant to award anything against either doctor because to do so would leave a permanent black mark against them and impair their right to earn a proper living. However, she stated her position that some award of damages should be made so that the cost to the County for such a long trial would not be viewed as a waste of money. She then established the ground rules for discussion of the amount of damages in terms of an award to Mr. Tillery in his individual capacity alone. Nothing under any other capacity nor specification of exact theory was permitted. For example, there was never any discussion made or allowed regarding Mrs. Tillery's loss of enjoyment of her life. In fact, Mrs. Norwood, Mrs. Hale and Mrs. Danbom all stated that since Mrs. Tillery would have died anyway there was no sense discussing this element.

"(f) Throughout the deliberations several other jurors and I had voted and stated consistently that it was our feeling that Dr. Richland as well as Dr. Rothman, was liable to plaintiff and that he had conducted himself below the acceptable medical standard of care. It was never intended by me nor was it expressed to me that a vote on an award of damages against Dr. Rothman would in any way constitute an exoneration of Dr. Richland. When the deliberations were over it was my understanding that we had voted to award damages against

Kert, and Aguilar, are identical in language and terminology except in two minor respects which will be noted herein below. All four affiants state that:

(a) Juror number 6, Sammie Danbom stated that she would not consider awarding Mr. Tillery any money at all because "why should he get anything when I make less than $6,000 a year."

(b) During the deliberations in the jury room juror number 5, Mary Hale stated "that Mr. Tillery was not entitled to any damages because he could not have loved his wife or have been hurt at losing her at all since he was willing to have her cremated."

(c) During the deliberations Mary Hale also stated that Mr. Tillery, if given any kind of sizeable award, would undoubtedly take it and "blow the money in Las Vegas on a good time." Juror number 6, Danbom "expressly signified her agreement with this statement."

(d) During the deliberations juror Danbom also stated that she was unwilling to find against either defendant especially Dr. Richland because "the evidence clearly shows that Dr. Richland is a decent and good man who saved other people's lives."

(e) The forelady, Norwood, stated that she was most reluctant to award anything against either doctor because to do so would leave a permanent black mark against them and impair their right to earn a proper living. However, she stated that some award should be made so that the long trial would not be a waste of money for the county. She established "ground rules for discussion in terms of an award to Mr. Tillery in his individual capacity alone." Also there was no discussion made or allowed regarding Mrs. Tillery's loss of enjoyment of her life. All three jurors Norwood, Hale and Danbom stated that since Mrs. Tillery would have died anyway there was no sense discussing this element.

(f) All four accusing jurors in identical language seek to impeach their own verdicts as "never intended."

---

Dr. Rothman but that we were unable to agree as to the liability of Dr. Richland and therefore no damages could be awarded against him. This was my feeling at the conclusion of the deliberations, when the verdict form was signed and when the court polled me. It was never made clear to me that in voting yes to the verdict I was voting to exonerate Dr. Richland from liability. That was not nor ever has been my desire.

"I declare, under penalty of perjury, that the foregoing is true and correct.

"Executed on March 20, 1981, at Los Angeles, California.

"PETER AGUILAR"

The affidavits of jurors Aguilar, Kert, and Ramirez are almost identical, word for word, except for those variations noted in the body of the opinion.

In addition, in paragraphs mostly identical in wording, jurors Kert and Ramirez aver that the evidence was never analyzed or discussed within the framework of the jury instructions. Finally, juror Ramirez refers to an action following the final vote while in the jury room by Mrs. Danbom making "a mocking caricature of attorney Kalnit [plaintiff's counsel]" placing her middle and index fingers horizontally against her lips and "deriding" Mr. Kalnit for having thick lips. Several women jurors "laughed at this gesture."

Respondent submitted affidavits of the four jurors whose statements or actions were questioned. They will be considered herein below.

 As background to our analysis it will be helpful to trace the genesis of the law respecting the impeachment of a verdict by the jurors.

From the inception of the recorded reports of California it was the rule that jurors could not impeach their own verdicts. This rule had its origin in an opinion of Lord Mansfield in the case of *Vaise* v. *DeLaval* (1785) 1 T.R. 11, 99 Eng.Rep. 944. It was based on an extension of the principle *nemo turpitudinem suam allegans audietur* (no man shall be heard to allege his own turpitude). In this case the jurors had reached their verdict by lot. Lord Mansfield classed this misconduct as a very high misdemeanor to which they would be confessing. Therefore they might not be permitted to do so.

In 1862, apparently in reaction to a scandal, the Legislature in California amended the then section 193 of the Practice Act (now § 657 of the Code of Civil Procedure) "to provide that verdicts obtained by 'resort to the determination of chance' might be impeached by the affidavits of the jurors." (See *People* v. *Hutchinson* (1969) 71 Cal.2d 342, 347 [78 Cal.Rptr. 196, 455 P.2d 132].)

The statute was interpreted for many years in accordance with the maxim *expressio unius, exclusio alterius est* (the expression of the one constitutes the exclusion of all else). Our Supreme Court in *People* v. *Gidney* (1937) 10 Cal.2d 138 [73 P.2d 1186], however, acknowledged the existence of a judicial exception to the rule, allowing jurors' affidavits to be used to prove that one or more of the jurors concealed bias or prejudice on voir dire.

Changes thereafter were made to the rule based on experience and justice. The policy against self-involving testimony was modified.

The problem involves a balancing of two conflicting policies. It is on the one hand necessary to prevent instability of verdicts, fraud, and harassment of jurors, but on the other hand, it is desirable to give the losing party relief

from wrongful conduct by the jury. (See *Kollert* v. *Cundiff* (1958) 50 Cal.2d 768, 773 [329 P.2d 897].)

■ In 1965, the Legislature enacted section 1150 of the California Evidence Code which provided that certain circumstances might be proved to impeach a verdict.

That law distinguishes between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror or jurors which can be neither corroborated nor disproved. (*People* v. *Hutchinson, supra,* 71 Cal.2d at p. 349.)

The only improper influences that may be proved under 1150 to impeach a verdict therefore are those open to sight, hearing and the other senses and thus open to corroboration. (*Id.*, at p. 350.)

■ In respect to the rule set forth in *Gidney, supra,* 10 Cal.2d 138, i.e., that concealed bias may be demonstrated to impeach a verdict, it is important to keep in mind that the rule is limited to allegations of occurrences during the trial and deliberations of the jury which tend to prove the existence of prejudice in the mind of a juror which would prevent his acting as an impartial juror, where the state of mind is alleged to have been entertained and to have been intentionally concealed during his voir dire examination. (*Estate of Mesner* (1947) 77 Cal.App.2d 667, 676 [176 P.2d 70].) ■ The record on appeal also contains the declaration of jurors Danbom, Hale, Bierk and Norwood, the foreperson, which will be discussed hereinafter.

Before proceeding to analyze the allegations of misconduct and concealed bias we take notice of the following circumstances surrounding the verdict.

The jury was polled and *mirabile dictu* all four of the jurors whose affidavits are submitted in support of the attack on the verdict, answered "yes" to the question "Is this your verdict?"

2. The jury deliberated for the better part of three days.

3. In the middle of the second day of deliberations the jurors sent for the instructions.

4. According to the affidavit of foreperson Norwood, the jury early in its deliberations found against any liability on the part of Dr. Richland by a vote of 10 to 2, with two jurors undecided.

5. The jury later did return a verdict in the amount of $51,000 against Dr. Rothman by a vote of 9 to 3.

In the case of *Johns* v. *City of Los Angeles* (1978) 78 Cal.App.3d 983, 991, 995-996 [144 Cal.Rptr. 629], a juror was alleged to have made reference as follows: " 'I wonder how long these lawyers shopped to get this black judge.' " (The defendants were black.) A new trial had been granted and was ordered reversed by this decision. The court stated: "To extrapolate from the alleged statement a finding that at the time the juror answered the voir dire question he did not do so honestly and without a bias which would prevent him from giving the plaintiffs a fair trial, requires considerable speculation.

"In the absence of a much clearer picture of the circumstances, the tone of voice, facial expressions and all of the other factors which give meaning to the spoken word, than is available from the affidavit of the Juror Reed, such speculation is simply unwarranted.

" . . . . . . . . . . . . . . . . . . . . . . . . .

"It was necessary then for the trial judge, before granting a new trial, to find that at the outset of the trial the juror as a 'demonstrable reality' (*People* v. *Compton* 6 Cal.3d 55, 60 [98 Cal.Rptr. 217, 490 P.2d 537]) was, because of a general bias against the plaintiff [citation] irrevocably committed to vote against the plaintiff regardless of the facts that might emerge in the trial [citation]." (*Ibid.*)

It is clear that the statements "why should we give him anything when I make only $6,000," "he'll blow the money in Las Vegas," "he's a good man who saves lives," "black mark" are offered in identical wording by each juror without any allegation as to the context in which the statements were made, or what proceeded or followed them, or what subject was actually being discussed by the jurors.

The argument that bias existed on the part of the alleged declarants at the time of their voir dire is a conclusion of appellant without evidentiary value.

The statement about $6,000 could very well have been made at a time when the subject of punitive damages first came up. To assume that it was discussed in respect to liability rather than damages is simply speculation. The cremation reference admits of no charge of impropriety since this is a matter which actually was testified to at trial and is part of the evidence. Similarly in respect to the "saves lives" comment there is no evidence of what the juror was talking about at the time. To infer that she was talking

about liability is an unwarranted assumption. She may well have been discussing plaintiff's vigorous claim to punitive damages. Likewise the "black mark against the doctors" statement is no basis for speculation or assumption that the declaring juror actually entertained that bias in respect to all doctors at the time of the voir dire. The statement is obviously directed at the doctors in this particular case and to speculate that it was based on anything other than the evidence heard would be completely unwarranted. Be it also remembered that notwithstanding this statement the jury did return a substantial verdict against one of the doctors.

In respect to the "Las Vegas" statement, once again the attributed statement is taken completely out of context. It is certainly not an indication of any preexisting bias and may well have been stimulated by the testimony and other evidence regarding the plaintiff's lively interest in having his wife's bills paid by the workers' compensation carrier. In the final analysis it did not deter the jury from rendering a plaintiff's verdict of $51,000.

As to the allegation concerning the analysis of evidence and the consideration of the evidence under the jury instructions we find that this involves a mental process by which the verdict was determined. It is prohibited under section 1150, which merely codifies the preexisting law in California. The same ruling applies to the identical paragraphs in all of appellant's jurors' affidavits about what they actually intended their verdict to be. It is clear that no juror can impeach his own verdict on this basis. The same conclusion applies to the allegations respecting the foreperson's conduct of the discussion. This involves the mental processes of the jurors. If any juror felt inhibited in any way he could very well have sent a note to the court. This concern is resolved when it is remembered that all four of these complaining jurors actually did concur in the verdict.

Finally as to the allegedly mocking caricature of plaintiff's counsel, this is an incident which is alleged to have occurred after the final vote. The effect on the minds of the other jurors, if any, is purely speculative. The word "deriding" in the affidavit is a conclusionary one. No words are reported. The allegation that another juror "signified" her concurrence is meaningless because the word "signified" is wholly vague.

In any event we hold that the event is trivial. At the hearing on the motion for a new trial the court noted that Mr. Kalnit himself during the trial had made reference to his own features.

Four affidavits of the accused jurors were submitted by respondent. Although the statements attributed to them are not explicitly denied in those

affidavits, the inferences of bias at the time of jury selection are directly rebutted in them.

It has been held that the affidavit of an involved juror denying prejudice is sufficient to support a negative finding on the issue. (See *Anderson* v. *Pacific Gas & E. Co.* (1963) 218 Cal.App.2d 276, 284 [32 Cal.Rptr. 328].) The four affidavits of the accused jurors introduced by defendant/respondent aver that extensive notes were taken, that the case was decided on the evidence and under the instructions, that every one of the jurors read the judge's instructions and the verdict forms were actually read aloud by juror Kert (one of the complaining jurors) before the jury agreed on one of the verdicts. It is clear and uncontroverted that the verdict of no liability against Dr. Richland was reached early in the deliberations.

Finally, although we find no misconduct or concealed bias, we have reviewed the entire record including the evidence to determine whether plaintiff received a fair trial, and find that he did. In fact, the assistance from the trial court in offering instructions to the jury on negligence notwithstanding the insistence by appellant that he was proceeding only on the theory of intentional torts and medical malpractice causing the intentional torts—not negligence—was a factor without which the plaintiff might not have received the verdict which was rendered against Dr. Rothman.

If transient comments made in the heat of discussion during deliberations become a potential vehicle for attacking the verdict of the jury, freedom of discussion in the jury room is chilled, and the free exchange of ideas is inhibited. Random phrases suspended in thin air, taken out of context, should not be the subject of a successful attack on the propriety of the verdict.

Jurors have a duty to discuss the case with fellow jurors. The exchange of views may well become vigorous. Comments may be acerbic, critical, even agitated. A juror may express an adverse comment in reaction to an exhibit, a witness' testimony or demeanor, personality, or credibility. These remarks may be candid, even unflattering. But cutting and sarcastic words do not ipso facto constitute jury misconduct.

Furthermore it can be observed that implicit in every adverse jury verdict is bias in a sense, against the position of the losing party, but such bias is based on the evidence and the instructions. Unless it can be demonstrated to have existed at voir dire, and at that time concealed, there is no impropriety.

In *Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98 [95 Cal.Rptr. 516, 485 P.2d 1132], a case heavily relied upon by appellant, the court stated at page 109, "All that we hold is that in the instant case, the court did not abuse its discretion in basing its findings [granting a new trial] on the declarations of the three dissenting jurors."

In the declarations offered to impeach this verdict there is no proof of any juror misconduct and no evidence of concealed bias.

The judgment is affirmed.

Hanson (Thaxton), Acting P. J., and Lillie, J.,* concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 4, 1984. Bird, C. J., was of the opinion that the petition should be granted.

---

*Assigned by the Chairperson of the Judicial Council.